Floyd "Bud" LEAFGREEN and Joyce M. Leafgreen, Plaintiffs and Appellants,

v.

AMERICAN FAMILY MUTUAL INSURANCE CO., American Family Life Insurance Co., and American Standard Insurance Co., Defendants and Appellees.

No. 15156.

Supreme Court of South Dakota.

Argued March 19, 1986.

Decided Sept. 3, 1986.

(image area)

Paul A. Mueller, Chamberlain, for plaintiffs and appellants.

Warren W. May of May, Adam, Gerdes & Thompson, Pierre, for defendants and appellees.

WUEST, Justice.

Floyd and Joyce Leafgreen (Leafgreens) appeal from a grant of summary judgment in an action charging American Family Insurance Company (American Family) with vicarious liability for conversion committed upon the Leafgreens by American Family Insurance Agent Edmund K. Arndt (Arndt). We affirm.

In February 1968, American Family and Arndt entered into an agreement whereby Arndt became an independent agent for the sale of insurance policies issued by American Family. Prior to the agreement, American Family investigated Arndt's background. Several individuals were interviewed in connection with the investigation, all of whom recommended Arndt for the position. A security check performed by Retail Credit of Minneapolis, Minnesota, indicated Arndt had no criminal record and his driving record showed no offense other than a 1963 speeding violation. After the South Dakota Insurance Department conducted its own investigation, Arndt was issued a license by the State to sell insurance.

From 1968 through 1981, Arndt had an extremely good record for insurance sales and service. During this period, his conduct was exemplary. Affidavits and exhibits reflect that Arndt was one of American Family's top agents. Not only was he an outstanding sales leader in the Rapid City District and the whole State of South Dakota, but in some months and years Arndt was considered one of the company's outstanding salesmen throughout the nation.

On May 22, 1981, Arndt went to the Leafgreen residence for the apparent purpose of correcting certain lot descriptions and writing liability insurance for them. In providing the lot descriptions, Leafgreens produced their hidden lockbox to examine a deed and thereby disclosed to Arndt the existence of their jewelry and other valuables. Leafgreens claim Arndt was really getting this information to assist two professional burglars, who later burglarized the residence.

It is undisputed that Arndt and the Leafgreens were personal friends. On Friday, June 26, 1981, Leafgreens went to Arndt's office and invited Arndt and his wife on a trip to Rapid City on Saturday. Floyd Leafgreen phoned Arndt on Saturday morning, June 27, 1981, and asked if Arndt and his wife had decided to join them. Arndt told Leafgreen he had made other plans. The Leafgreen home was burglarized that day while they were in Rapid City.

On March 3, 1983, Jack DeFea, American Family's Rapid City District Manager, was advised by Arndt's secretary, Donna Kemery, that a search warrant had been issued for Arndt's home and that property belonging to Leafgreens had been found in the home. DeFea consulted with American Family executives and counsel and, on May 16, 1983, Arndt was advised that his contract with American Family would terminate on May 31, 1983. On April 1, 1983, a Hughes County Grand Jury filed a three-count indictment against Arndt. On April 4, 1984, Arndt pleaded guilty to Count III of the indictment, aiding and abetting second-degree burglary under SDCL 22–32–3 and SDCL 22–3–3. He is presently incarcerated in the South Dakota Penitentiary.

On April 18, 1984, Leafgreens filed a complaint against American Family, which alleged: Arndt used his status as an American Family insurance agent to gain entry into the Leafgreen home on May 22, 1981; he gathered information concerning Leafgreens' valuables with the intent to promote and facilitate the crime of burglary; and used the information to advise two co-conspirators—convicted felons—who

committed the burglary on Saturday, June 27, 1981. The Leafgreens argued that Arndt's tortious conduct should be imputed to American Family because it placed Arndt in a position which enabled him, while apparently acting within his authority as an agent of American Family, to commit a fraud[1] upon Leafgreens; namely, the June 27, 1981, burglary of their home.[2]

On June 28, 1985, American Family filed a motion for summary judgment, contending Leafgreens' complaint contained no genuine issue of material fact and that American Family was entitled to judgment as a matter of law because Arndt was not acting within the scope of his employment when he conspired to burglarize Leafgreens' home. The trial court granted summary judgment in favor of American Family on the issue of vicarious liability, stating in its memorandum decision that Arndt's tortious acts were not reasonably foreseeable by American Family and, consequently, it would be inequitable to impute Arndt's conduct to the company. Leafgreens appeal.

The issue for our determination is whether the doctrine of *respondeat superior* warrants that American Family be held vicariously liable in tort for the burglary of Leafgreens' home, because Arndt used his status as an American Family insurance agent to gain information regarding the property stolen in the burglary. The issue is one of first impression in South Dakota and we are guided, in part, by various rules set out in the Restatement (Second) of Agency.[3]

 Under general rules of agency law, a principal may be held liable for fraud and deceit committed by an agent within his apparent authority, even though the agent acts solely to benefit himself. *American Soc. of Mech. Eng'rs. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Gleason v. Seaboard Air Line Ry. Co.*, 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *see also Nat. Acceptance Co., Etc. v. Coal Prod'rs Ass'n*, 604 F.2d 540 (7th Cir.1979); 10 W. Fletcher, Cyclopedia of the Law of Private Corporations ¶ 4886, p. 393 (rev. ed. 1978); W. Seavey, Law of Agency § 92 (1964). "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."[4] Restatement (Second) of Agency § 8 (1958).

Restatement (Second) of Agency § 261 provides:

A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

Comment a to section 261 states:

The principal is subject to liability under the rule stated in this Section although

---

1. In their complaint, Leafgreens use the term fraud; however, the facts they state really allege a conversion.

2. Leafgreens' complaint contained a second cause of action alleging that American Family owed them a duty to exercise reasonable care in the selection, retention and review of Arndt, its resident agent, and that American Family breached the duty by negligently retaining Arndt when it knew or should have known he was untrustworthy and dishonest. However, the trial court also granted summary judgment on this cause of action for negligence and appellants did not appeal that portion of the judgment. At oral argument, they made it very plain they had abandoned that theory and were relying upon vicarious liability. Possibly, the

"bad conduct" cited by the dissents would have been relevant in the negligence action.

3. "The Restatement of Agency is a normative statement of principles for determining when a master or principal may be liable for the tortious or criminal acts of a servant or other agent when ... the principal has not actually authorized or ratified unlawful conduct." *Kasner v. Gage*, 281 Minn. 149, 151, 161 N.W.2d 40, 42 (1968).

4. Apparent authority is analogous to "ostensible" authority which is defined in SDCL 59-3-3 as authority "such as a principal intentionally, or by want of ordinary care, causes or allows a third person to believe the agent to possess."

he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

While the boundaries of a principal's liability under this rule are not easily drawn, as the Reporter's Notes to section 261 suggest, they do exist:

> It is difficult to state more definitely than is done in this section the limits of liability. It would seem to be clear that if the agent is purporting to act as an agent and doing the things which such agents normally do, and the third person has no reason to know that the agent is acting on his own account, the principal should be liable because he has invited third persons to deal with the agent within the limits of what, to such third persons, would seem to be the agent's authority. To go beyond this, however, and to permit the third persons to recover in every case where the agent takes advantage of the standing and position of his principal to perpetuate a fraud would seem to go too far.... In some cases the situation is ambiguous: the agent performs his primary function as an agent ... acting within the scope of his powers as such agent without loss to the other from the transaction itself, but the transaction is used as a means by which the agent may defraud such other. If in such cases the principal benefits from the agent's act, his liability to the extent of the benefits received is clear. If, however, the principal is not benefited, and the transaction which actually causes the loss is not one in which the agent purports to represent the principal, liability should not follow.

The situation in the present case is indeed ambiguous. Arndt entered Leafgreens' home and gained information concerning the location of their valuables by purporting to act within the scope of his powers as an American Family insurance agent, without loss to Leafgreens. The transaction, however, was used to facilitate the burglary which occurred approximately five weeks later.

A review of several foreign cases demonstrates the manner in which courts of other jurisdictions have applied the foregoing principles. In *Bowman v. Home Life Insurance Company of America*, 243 F.2d 331 (3rd Cir.1957), a male field underwriter masqueraded as the company's physician, and conducted intimate physical examinations upon the female plaintiffs, who had applied for insurance. The insurer furnished the underwriter with the plaintiffs' application cards, which entitled him to ask many questions. The underwriter obtained a black bag which looked like a physician's kit, called upon the plaintiffs at their home and made the examinations. Applying Pennsylvania law and the foregoing Restatement rules, the Third Circuit Court of Appeals determined that the underwriter's conduct could be attributed to his employer. The court noted that even though the agent went further than his instructions and committed a tort upon the plaintiffs, "this was the kind of deceit which was well within the insignia of office with which he had been clothed." 243 F.2d at 334.

In *Lucas v. Liggett & Meyers Tobacco Co.*, 50 Haw. 477, 442 P.2d 460 (1968), the owner of a supermarket sued a cigarette manufacturer for the value of cigarettes stolen by a cigarette sales representative. The evidence showed that while servicing a cigarette rack in the store, the representative had stolen a quantity of the product over an extended period of time. The stolen cigarettes were billed to the supermarket by the wholesale supplier, to which the supermarket owners had made payments. Rejecting the argument that the tobacco company was not liable because the sales agent was acting outside the scope of his employment when he committed the thefts, the Supreme Court of Hawaii held the com-

pany liable for the acts of its agent. The court relied on the foregoing Restatement rules, and pointed out that the company put the agent in a position to commit the thefts and that from the plaintiff's point of view all of the agent's activities connected with servicing the cigarette rack were apparently authorized by the principal. The court emphasized that company's division manager often accompanied the agent and gave no indication that he disapproved of the agent's activities.

In *Dudley v. Estate Life Ins. Co. of America,* 220 Va. 343, 257 S.E.2d 871 (1979), two individuals brought an action against a life insurer and its agent for fraud in connection with the agent's sale of an interest in premiums on a policy sold through his agency. Plaintiffs alleged that during the period of time in question, the agent made certain misrepresentations which induced them to purchase "one unit" of a special type of life insurance policy and to pay large sums of money upon the agent's promise that they would each receive one-fourth of one percent of all insurance premiums collected from other sales of the special policy. Plaintiffs alleged the representations were in fact part of a scheme by which the agent defrauded them. The Supreme Court of Virginia held the issue on appeal was whether plaintiffs' evidence established prima facie that the agent acted within the apparent scope of his authority thereby making the insurer liable for the alleged fraud. Applying the foregoing Restatement principles to the facts, the court determined that plaintiffs' evidence was sufficient to raise a jury issue on the question of whether the agent's conduct was attributable to his principal. The court noted that the insurer put the agent in a position to perpetrate the fraud and that, from a third person's point of view, the agent was clothed with all the authority necessary to sell its product and to recruit others to become salesmen for the insurer. Further, the court held the agent's position facilitated the consummation of the fraud whereby he improperly

extracted a total of $12,000 from the two plaintiffs. Under the circumstances, plaintiffs were entitled to rely on statements made by the agent, who was purporting to act and was apparently acting in the interests of the insurer.

In *Lou-Con, Inc. v. Gulf Building Services, Inc.,* 287 So.2d 192 (La.App.1973), the client of a janitorial service brought an action against the service and its insurer for damages to the customer's building which was burned down by the janitorial company's employee. The employee was given the keys to the building in connection with his janitorial duties without any restrictions except that he was to use the keys to perform the services agreed to on certain evenings. The plaintiff cited Restatement (Second) of Agency § 261, *supra,* and several cases applying the section—including *Lucas v. Liggett & Myers Tobacco Company, supra,*—to support its contention that the janitorial service should be held liable for the arson committed by the employee under the theory of apparent authority. The Louisiana Court of Appeal held that under the facts of the case, section 261 must be read in connection with section 231 of the Restatement.

The fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result. The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do.[5] .... A servant selling goods for his master may cause the master to be liable in an action of deceit, although the servant was guilty of obtaining property by false pretenses in

---

5. The Louisiana Court quoted this paragraph and cited it as section 231. This language actual-ly appears in COMMENT a to section 231.

making the sale.... As in other cases, it is a matter of degree, the question being whether or not the conduct is so unlike that authorized that it is a substantially different thing.

Restatement (Second) of Agency § 231 COMMENT a (1958).

The Louisiana Court took the facts of the case and applied section 231 and comment a to section 231. The court held that the janitor's freedom of access to the building did not form a basis for tort liability on the part of the janitorial service because it was not foreseeable that he would commit the crime of arson simply because he had the keys in his possession and could gain access to the building.

■ Restatement (Second) of Agency § 231 focuses on startling or outrageous actions of an agent used as a means of achieving an authorized result. The section deals with the foreseeability of an agent's criminal or tortious conduct from the principal's point of view. Under section 261 and the theory of apparent authority, however, the agent's conduct is seen through the eyes of the third party. The principal is estopped from asserting the agent's lack of authority because he clothed the agent with the authority to act, and the third party reasonably relied on that authority to his detriment. Nevertheless, in ambiguous situations like the case before us, section 231 imparts an element of foreseeability which helps to delineate the limits of liability under the doctrine of *respondeat superior* for acts done within the scope of an agent's apparent authority.

The theoretical basis and scope of the doctrine of *respondeat superior* were reviewed extensively in *Rodgers v. Kemper Const. Co.*, 50 Cal.App.3d 608, 618, 124 Cal.Rptr. 143, 148 (1975).

The doctrine, which departs from the normal tort principle that liability follows fault, is an ancient one but its scope and stated rationale have varied widely from period to period. [citations omitted] It has been aptly stated that 'Respondeat superior has long been a rule in search of a guiding rationale.' (Note, 82 Harv.L. Rev. 1568, 1569.) ... In some respects [the] rationale is akin to that underlying the modern doctrine of strict tort liability for defective products. [citations omitted] It is grounded upon 'a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.' [citations omitted].

The court in *Rodgers* refined a test of foreseeability for vicarious liability set out in *Ira S. Bushey & Sons, Inc. v. United States,* 398 F.2d 167 (2nd Cir.1968), stating:

One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity. However, 'foreseeability' in this context must be distinguished from 'foreseeability' as a test for negligence. In the later sense 'foreseeable' means a level of probability which would lead a prudent person to take effective precautions whereas 'foreseeability' as a test for respondeat superior merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [citations omitted] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer.

*Rodgers*, 50 Cal.App.3d at 618–19, 124 Cal. Rptr. at 148–49; *see also Harris v. Trojan Fireworks Co.,* 120 Cal.App.3d 157, 174 Cal.Rptr. 452 (1981).

■ We think it fairly stated that a principal is liable for tortious harm caused by an agent where a nexus sufficient to make the harm foreseeable exists between the agent's employment and the activity which actually caused the injury; foreseeable is used in the sense that the employee's conduct must not be so unusual or startling that it would be unfair to include the loss

caused by the injury among the costs of the employer's business.

■ Applying this test to the facts before us, with a view toward the propriety of summary judgment, we believe there was not such a connection between Arndt's employment as an American Family insurance agent and the burglary which actually caused the harm to Leafgreens, as to make the harm foreseeable. Arndt's conduct was outrageous and, as the trial court stated, unforeseeable by American Family or anyone else for that matter. It would be unfair to impute liability to American Family for Arndt's felonious acts for various reasons. First, we note that American Family was defrauded by Arndt as well, inasmuch as the stolen property was covered under American Family policies. Indeed, American Family received no benefit from the transaction; but, rather, it incurred a liability. Second, the burglary occurred some five weeks after Arndt used his employment with American Family as a subterfuge to enter the Leafgreen home and gather information used in the burglary. While it may be said Arndt's entrance into the home was incidental to his employment with American Family, the burglary clearly was not. Thirdly, Arndt learned that Leafgreens would be in Rapid City the day of the burglary through his friendship with Leafgreens, and not because of his status as an American Family insurance agent. Finally, we believe extending liability to a situation such as this would be prescribing a form of strict liability upon employers under the doctrine of *respondeat superior*. To hold employers liable in such situations as a cost of doing business would be unfair.

Accordingly, the judgment is affirmed.

FOSHEIM, C.J., and MORGAN, J., concur.

HENDERSON and SABERS, JJ., dissent.

HENDERSON, Justice (dissenting).

This was a tortious securing of money/property from the victims' home. It resulted from the insurance company placing the insurance agent, Arndt (the tortfeasor), into the Leafgreens' home while he was acting within his authority; so acting, he facilitated the fraud upon the Leafgreens. Plaintiffs' complaint sounds in vicarious liability under the theory of respondeat superior. Restatement (Second) of Agency § 261, at 570 (1958) provides: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." *See also, Phillips Petroleum Co. v. Royster,* 256 So.2d 559, 560–61 (Fla. 1972). And numerous cases exist, which recognize a principal's liability for its agent's acts of extorting or defrauding customers of money. *See,* e.g., *Berkovitz v. Morton-Gregson Co.,* 112 Neb. 154, 198 N.W. 868, 33 A.L.R. 85 (1924); *Wilmerding v. Postal Telegraph Cable Co.,* 118 A.D. 685, 103 N.Y.S. 594 (1907); *Birkett v. Postal Telegraph Cable Co.,* 107 A.D. 115, 94 N.Y.S. 918 (1905); *Billups Petroleum Co. v. Hardin's Bakeries Corp.,* 217 Miss. 24, 63 So.2d 543 (1953); and *Cleaney v. Parker,* 167 Ala. 134, 51 So. 951, 140 Am. St.Rep. 21 (1910).

Enter SDCL 58–30–23. An agent, in South Dakota, shall be "trustworthy, of good character and reputation as to morals, integrity, and financial responsibility...." When zeroing in on the bottom rationale of the majority opinion, it becomes apparent that the majority opinion relies upon "foreseeability" and then pegs a definition of foreseeability to an "unfair" concept, i.e., that a loss to an insurance company caused by the injury of its agent should not be borne as costs of the employer's business. Who put the fox in the hen house? State law requires these agents to be honest. Would it be such a leap of unreasonable logic to assume that an insurance company would monitor the conduct and honesty of its agent? And from a standpoint of fairness, would it not be more fair for the insurance company to bear the loss than the innocent victim?

That the Leafgreens were friends of the agent is totally immaterial. Is the majority suggesting that this is some type of contributory negligence? Likewise, that Arndt was a capital fellow with only a speeding offense, as the majority opinion suggests, has no probative force.[1] Leafgreens were deceived, burglarized, taken advantage of, but this hint of friendship in the majority opinion is not a contributory negligence defense.

> Contributory negligence on the part of the deceived person is not generally recognized as a defense. However, if a third person should know or otherwise has notice that an agent is acting for his own purposes or is otherwise violating his authority, the principal is not liable.

Restatement (Second) of Agency § 262 comment c, at 573 (1958). Contributory negligence is a defense to an action for negligence, not a willful tort. *Carroll v. First Nat'l Bank of Lincolnwood*, 413 F.2d 353, 356 (7th Cir.1969), *cert. denied*, 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970). *See also, Omaha Nat'l Bank v. Mfrs. Life Ins. Co.*, 213 Neb. 873, 332 N.W.2d 196 (1983); and W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 65 (5th ed. 1984).

Contracts of insurance result from personal calls by agents upon prospects at their home. Insurance companies know this is a part of the salesmanship game. Unquestionably, insurance companies would not fare well if agents did not enter the privacy of homes. Were this salesmanship closed down, sales would drop. When an insurance agent goes to the home of a prospective customer, he has an insignia of approval by his insurance company; if he goes sour and cheats, deceives, or even burglarizes that home based upon knowledge he gained by getting into the front door, the insurance company wants to say: "He's not our boy. We claim him not." I say: "It's too late for that Pontius Pilate attitude." The insurance company cannot wash its hands. It clothed him with an aura of honesty and respectability. Arndt was its agent when he was hired, its agent when he tried to sell insurance, its agent when he went into the home to obtain a sale, its agent when he obtained money for them, its agent when he surveilled the home for his burglar-friends, its agent when he learned of the steel lockbox and its contents,[2] and was still acting as its agent when he conspired to have the insurance company's customer burglarized. American Family Insurance does not advocate that Arndt was not its agent when he called on the Leafgreens on May 22, 1981. The Leafgreens trusted this insurance agent. After all, with a name like American Family Insurance Company, surely that insurance company would want any American family to know that it can trust it and also its agents in the field, right? Choosing such a name was surely no perchance happenstance.

Let us take off our judicial blinders. We are not deciding if American Family Insurance Company is liable; we are deciding if a question of fact exists so that a jury can

---

1. The settled record indicates that Arndt was not a capital fellow, that Arndt's conduct was not exemplary, and that American Family Insurance knew it; further, that American Family expressed written displeasure unto Arndt. As concerns Arndt's business practices, the settled record contains letters from Arndt's superiors which express American Family's disappointment with how Arndt was conducting his agency. This disappointment concerned Arndt's ownership of a beer tavern; his failure to attend insurance meetings; and a non-sufficient funds check problem. As concerns Arndt's exemplary conduct prior to the burglary on June 27, 1981, the record also reveals that Arndt was arrested for assault and battery, simple assault, disorderly conduct, and an open container violation.

2. When Leafgreens produced their documents to Arndt for correct legal descriptions of property which the insurance company had issued liability coverage upon, Arndt was acting as an agent for American Family Insurance. Should we not allocate the risk of the servant's misbehavior under these circumstances? Surely, a question of fact exists once the vicarious liability question is hurdled. *See Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167 (2nd Cir.1968).

decide whether American Family is liable. Negligent hiring has been abandoned. In my opinion, fraud is alleged and fraud is alive. Is there a fact question on fraud—that is the issue. American Family Insurance is obviously chargeable with knowledge of the conduct of its agent in factual situations that apparently outraged them. This buttresses the early cases which I have collected and cited, *infra*. Further, as I review the majority opinion, the authorities appear to sustain this dissent as much as the majority opinion. That is, until as academicians we reach "foreseeability" and the affixation of responsibility based upon "unfairness." It is in the application of these authorities to the facts at hand wherein we differ. The fox in the hen house was placed there by the insurance company—not an American family. Bottomed in fairness, it is a question of fact if the party who put the fox in the hen house should be held responsible for what the fox does. Accordingly, under the facts of this case, and authorities cited herein, this family is entitled to a jury trial. I would therefore reverse.

SABERS, Justice (dissenting).

I dissent.

The first question presented is:

## 1. WAS SUMMARY JUDGMENT PROPER?

In determining whether summary judgment was proper in *Hamaker v. Kenwel-Jackson*, 387 N.W.2d 515, 517 (S.D.1986), we stated:

1. Arndt's supervisor stated that from the very beginning Arndt's record was outstanding, he excelled as a salesman, and as a member of the "sales training staff." He further stated that Arndt was not only an outstanding sales leader in the Rapid City District and the State of South Dakota, but he also held the record as one of the company's outstanding salesmen throughout the nation. The supervisor also testified that at the time of his discharge as an agent, Arndt was servicing some 3300 policies in central South Dakota.

2. In addition to the problems and disappointments referred to in footnote one of Justice Henderson's dissent, it is important to

In summary judgment, the burden of proof is on the moving party to show clearly that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. Summary judgment is an extreme remedy and is not intended as a substitute for a trial.

*Wilson v. Great Northern Railway Company*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968).

In summary judgment, the pleadings, affidavits, depositions, and every reasonable inference arising therefrom must be viewed most favorably toward the nonmoving party. Moreover, the appellate court is not bound by the factual findings of the trial court. Instead, it must conduct an independent review of the record. *Hurney v. Locke*, 308 N.W.2d 764, 767 (S.D.1981); *Trapp v. Madera Pacific*, 390 N.W.2d 558 (S.D.1986).

American Family urges that Arndt's outstanding attainments over a period of thirteen years gave no notice to American Family that it would be characteristic for him to impart information to others that facilitated the theft from his friend Leafgreen. In fact, American Family asserted that, "from his appointment in February of 1968 through June 27, 1981, [the day of the theft], Arndt's conduct was exemplary."[1] This simply is not entirely true and raises a material question of fact.[2]

note the strong language used and apparently needed to "reform" this "exemplary" agent.
As early as August 12, 1977, American Family Insurance's State Director was advising Arndt, in writing, with copies to Arndt's district manager, that:
—Arndt had some major problems in separating himself from a beer business, and as far as they were concerned, it had to be done. "Just so there is no misunderstanding, Ed of what I told you—within twelve months you are going to have to decide whether you can really get yourself out of the beer business even by association, because if you can't, we are going

In *Williams v. Feather Sound, Inc.*, 386 So.2d 1238 (Fla.2d DCA 1980), the occupant of a townhouse sued the developer, Feather Sound Inc., (Feather Sound), for injuries sustained when she was assaulted by one of the developer's employees, James Carter (Carter). The trial court awarded summary judgment to Feather Sound. In reversing the judgment, the court held:

> If an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so.

*Id.* at 1240. Although this case deals with an aspect of the doctrine of negligent hiring, which is not an issue here, it is nevertheless pertinent.

Feather Sound initially hired Carter as an outdoor laborer without access to the interior of the townhouses. Approximately three weeks after he was hired, Carter's duties changed as a result of a departmental transfer. He was assigned work inside the condominium units. He was given access to passkeys to the townhouses and permission to use them in order to gain entrance to make necessary repairs. *Id.* at 1239.

The evidence showed that Carter used a passkey to gain entry into the apartment in which he assaulted Williams. The evidence further showed that Carter had a history of criminal and mental problems. There was no indication that Feather Sound had any knowledge of Carter's criminal or psychiatric record. *Id.* Feather Sound conducted no background check, nor contacted the references or the two prior employers listed on Carter's job application before they hired him. *Id.* The court stated:

> Most jurisdictions ... recognize that independent of the doctrine of respondeat

---

to have to look for someone to replace you as agent."

As early as June 9, 1978, Arndt's district manager wrote, with copies to Dakota State Director, that:

—"Ed—I am writing you in disappointment of how you are conducting your agency in the past few months."

—Concerning missed meetings, "... You never attended, and no word from you concerning same until I called you."

—Concerning personal calls to Arndt's office in Pierre, "... This past week I talked with you on Saturday, June 3rd, and you know [sic] I was coming over on Wednesday, June 7th. When I came over no message or notice on the door—no phone call to me, etc. This not only bothers me as to your relationship with me, but your concern to your policy holders ..."

—"Ed, you also have had a non-sufficient funds problem with your checks—I hope this is a past problem but had a letter dated May 22nd concerning a check dated March 29, 1978—I hope this has been taken care of."

—"Ed, as you know you have a serious family problem too—."

—"These problems must be solved before I can turn over additional business to you ..."

All of these problems, along with Arndt's arrests for assault and battery on May 4, 1977, simple assault and disorderly conduct on February 15, 1979, and open container on June 16, 1981, predate the theft of June 27, 1981. They were a preview of things to come:

—Arndt's continuing alcohol problems;

—August 15, 1981 and November 18, 1981: Arrests for DWI;

—June 30, 1982: IRS Notice of Levy on wages for taxes due;

—September 5, 1982: Substantial check problems with customers and other insurance companies;

—September 16, 1982: Arrest for failure to file sales tax return with intent to evade;

—January of 1983: Non-sufficient funds check in the amount of $4,854.17 to American Family;

—March of 1983: Account delinquencies with American Family Insurance in the amount of $13,531.47;

—March of 1983: Substantial civil debt problems including another IRS levy;

—April 1, 1983: Arrests for perjury, retaining stolen property and aiding and abetting (the theft);

—May 31, 1983: Arndt's termination as an American Family Insurance Agent for insufficient checks.

Whether these prior problems were an accurate indicator of the future problems is difficult to determine. These prior problems clearly indicate a person losing his control, his concern for others, and his sense of responsibility. This can lead to deception and dishonesty. In this case, hindsight tells us that these problems accurately indicated things to come. Whether these prior problems made the later problems, (specifically the theft), reasonably foreseeable for American Family is discussed in question 2.

superior, an employer is liable for the willful tort of his employee committed against a third person if he knew or should have known that the employee was a threat to others.... The more difficult question, which this case presents, is what, if any, responsibility does the employer have to try to learn pertinent facts concerning his employee's character.

*Id.* at 1239–1240.

After recognizing that the rule is not altogether clear, the court stated that the employer's responsibility to check out an applicant's background is necessarily dependent upon the type of work to be done by the prospective employee. Thus, when Carter was hired to do outside work on the grounds of the townhouse development, during which he would have only incidental contact with the tenants, the court found that Feather Sound did not have an obligation to make an independent inquiry concerning Carter's past. However, the court found that Feather Sound's duty to make a reasonable inquiry about Carter's background arose before they transferred him to inside work and gave him access to the townhouse passkeys. *Id.* at 1240. The court held:

> [W]hen Feather Sound permitted Carter to have access to the townhouses, Feather Sound was chargeable with such information concerning his background as it could have obtained upon reasonable inquiry.

*Id.* at 1241.

Here, the evidence indicates that American Family had ample knowledge of Arndt's professional and personal problems, and even part of his criminal record, prior to the theft. Yet they allowed him to continue his employment when they knew he had the authority to enter the private dwellings of others. In light of American Family's insistence upon Arndt's sterling character, fact questions exist concerning the extent that American Family was chargeable with information about Arndt's prior conduct and problems, and the foreseeability thereof.

Since summary judgment is appropriate to dispose of legal, not factual questions, it was inappropriate in this case. *Trapp, supra.* Although this case should be reversed and remanded without considering any other issue, the second question presented is:

## 2. DID THE FACTS PRESENT A JURY QUESTION?

The test is: Could reasonable minds differ under these disputed facts, as to whether the actions of Arndt were a part of or incidental to the business of American Family Insurance Company. *See: Rodgers v. Kemper Construction Co.,* 50 Cal. App.3d 608, 619, 124 Cal.Rptr. 143, 149 (1975): "[W]here the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer." [citation omitted]; *Dudley v. Estate Life Ins. Co. of America,* 220 Va. 343, 257 S.E.2d 871, 875 (1979): "[A] principal is liable for the fraudulent and deceitful acts of his agents 'committed as an incident to and during the performance of an act which is within the scope of the agent's authority.'" [citation omitted]; *Harris v. Trojan Fireworks Co.,* 120 Cal.App.3d 157, 163, 174 Cal.Rptr. 452, 456 (1981): "[L]iability attaches where a nexus exists between the employment or the activity which results in an inquiry that is foreseeable ... Foreseeable is here used in the sense that the employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among the other costs of the employer's business."

Thus, if reasonable minds could differ as to whether Arndt's conduct imputed liability to American Family under the tests set forth above, a jury question was presented and it would be improper for the trial court, or this court, to usurp that function. As mentioned by the majority, the *Dudley* court held that the plaintiffs' evidence raised fact questions for jury determination. 257 S.E.2d at 876. The insurance

agent in *Dudley* made fraudulent misrepresentations to the insureds to procure personal gain. The insurer argued that since the fraud was committed solely for the agent's personal gain without benefit to the insurer, then the fraud was committed outside the scope of the agent's authority, and thus relieved the principal from liability. *Id.* at 874. The court was unpersuaded by this argument and stated:

> [W]e think plaintiffs' evidence was sufficient to raise a jury issue on the question whether [agent's] conduct was attributable to his principal. Estate Life [insurer] put [agent] in a position which enabled him, while apparently acting within his authority, to perpetrate the frauds upon [plaintiffs]. And on this evidence, we cannot say as a matter of law that plaintiffs had notice that [agent] was acting for his own purposes.[3]

*Id.* at 876.

Similarly, as a matter of law, can we rule that there was no nexus between Arndt's visit to the Leafgreen home on May 18, 1981, in his capacity as an American Family agent to review liability insurance and the subsequent theft on June 27, 1981? I think we cannot. From the Leafgreens' point of view, Arndt was clothed with all the authority of American Family Insurance Company necessary to sell its product. He cultivated a relationship with the Leafgreens over an extended period of time which in effect, lulled them into a false sense of security. Arndt's presence at the Leafgreen home, his learning of the existence of the box with cash, valuables, and important papers, and learning which room the box was stored in were all a part of or directly incidental to the business of American Family Insurance Company. Surely there exists a jury question under the *Dudley* rationale as to whether the Leafgreens had notice that Arndt was acting for his own purposes.

It appears that Arndt's key knowledge that Leafgreens would be in Rapid City for an entire day resulted more from his personal friendship with Leafgreens than from his employer's business. Whether this friendship with Leafgreens arose from the business of American Family or vice versa is not clear from this limited record.

Arndt's decision to engage others in the theft of these valuables was made during his employment with American Family, and so was the theft itself. The fact that Arndt damaged American Family at the same time by causing an insurance loss, is an important consideration but is not necessarily determinative.

This summary analysis of these important questions leads me to conclude that reasonable minds could differ. Therefore, Leafgreens are entitled to have a jury determine these questions under proper instructions. We should reverse and remand to the trial court for a jury trial.

---

**3.** It is interesting to note that the *Dudley* decision attributed liability to the principal based in substantial part upon the authorities cited in the majority opinion.