# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4305

_____

Debra St. John,

        Appellant,

v.

United States of America,
acting through the Bureau of
Indian Affairs,

        Appellee.

\* Appeal from the United States
\* District Court for the
\* District of South Dakota

_____

Submitted: October 16, 2000

Filed: February 7, 2001

_____

Before McMILLIAN, HEANEY and BOWMAN, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Debra St. John appeals from a final order entered following a bench trial in the United States District Court[1] for the District of South Dakota concerning claims brought against the government pursuant to the Federal Torts Claims Act (FTCA), 28 U.S.C. § 2671 et. seq., based upon the conduct of her ex-husband, a Bureau of Indian

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

Affairs (BIA) police officer. The district court awarded St. John damages for false arrest and false imprisonment and dismissed her sexual assault claim for lack of jurisdiction under the FTCA because the sexual incident in question occurred outside the scope of her ex-husband's federal employment. St. John v. United States, No. CIV 97-3051 (D.S.D. Oct. 6, 1999) (judgment). For reversal, St. John argues that the district court erred in (1) holding that her ex-husband's sexual assault constituted conduct beyond the scope of his federal employment and (2) calculating the damage award for false imprisonment and false arrest. For the reasons discussed below, we affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

## Jurisdiction

Jurisdiction in the district court was proper based upon 28 U.S.C. § 1346; jurisdiction on appeal is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

## Background

The following summary is based upon the findings of the district court. Debra St. John and Richard Coleman were married in 1984 and had three children. In 1989, Coleman began working as a police officer for the BIA. The couple divorced in 1990, but continued to have contact with each other for child visitation purposes. After the divorce, they continued to have consensual sex, but they disagree regarding the frequency. In 1993, St. John alleged that Coleman tried to rape her in her home. She acquired a twelve-month protection order against him. The parties dispute the occurrence of consensual sex after that time; St. John contends that it did not occur, while Coleman argues that they had an ongoing sexual relationship.

Coleman's children visited with him on Thanksgiving day, 1995. The next day, because St. John did not pick up the children at the agreed time, Coleman brought the children to work with him and then left work to drive the children to Pierre, South Dakota,[2] where he left them with St. John's friend, Gerilyn Livermont, before returning to work.

Later that evening, St. John drove to Coleman's workplace to pick up the children. She arrived at approximately 11:00 p.m. with her uncle, William Gravatt, who had accompanied her the entire evening. The parties disagree about the exact time of St. John's arrival and her actions beforehand. Both St. John and Gravatt testified that they did not drink any alcohol that evening. Gravatt further asserted that St. John did not appear to be intoxicated in any way.

Within minutes of her arrival, St. John exited the police station, followed by Coleman. On the stairs outside the station, St. John and Coleman argued, and Coleman grabbed St. John by the shoulder, pulled her arms behind her back, told her that she was under arrest, pushed her through the door of the police station, made her empty her pockets, and then placed her in the "drunk tank." Coleman did not tell St. John why she was arrested. Rio Owen, the radio dispatcher at the police station that night, did not observe that St. John was drunk or dangerous to herself and did not agree with Coleman's decision to arrest her. Another officer disagreed with St. John's arrest, voiced his objection to Coleman, and left the station. On the activity log, the property list, and the prisoner roster, Coleman noted the reason for St. John's arrest as "disorderly conduct." After finishing his shift at 2:30 a.m. and sleeping for one and a half hours, Coleman changed the charge to "protective custody" and released St. John following approximately five and a half hours in jail.

---

[2]St. John lived in Pierre, South Dakota, approximately 70 miles from Coleman's residence and workplace in Fort Thompson, South Dakota.

At the time of St. John's release, Coleman was unarmed[3] but still wearing his police uniform and his badge, even though it was customary for officers to leave their badges at the police station when they were off-duty. Coleman left the building first, followed by St. John, who exited from the same door approximately 2 minutes later. St. John claims that she intended to walk 2-3 blocks to her sister's home.

According to St. John, Coleman was standing next to his truck in the parking lot and told her to get into it, which she refused to do because she was upset that he had arrested and jailed her. St. John claims that Coleman then approached her and she ran around the truck, trying to get away from him and continuing to refuse until Coleman threatened to put her back in jail if she did not get into the truck. At that point she got into the vehicle. St. John alleges that Coleman then drove to a deserted park area 35 miles away, where it was freezing cold, with nowhere for her to go, and raped her. According to Coleman, St. John willingly got into the truck, and the two engaged in consensual sex.

After the sexual encounter, Coleman drove St. John to her home. St. John contends that Coleman forced her to take a shower. Then the two went to pick up the children at Gerilyn Livermont's home, which St. John entered alone. Livermont testified that St. John was visibly shaken and told her that Coleman had thrown her in jail and then raped her, but the conversation ended when the children appeared. St. John v. United States, No. CIV 97-3051 at 25. St. John also told a family member and her employer about the rape, but did not immediately notify the Tribal police department. She explains her silence as the result of fear and the department's history of neglecting her complaints about Coleman. Eventually St. John spoke to Ken Ross, the criminal investigator for the Crow Creek Sioux Tribe (of which she is a member).

---

[3]Coleman was not carrying his police firearm, but did have his personal hunting rifle in his truck, which was parked in the BIA police station lot approximately five to ten feet from the jail entrance.

Ross informed Victor Roy Ziegler, Coleman's BIA supervisor and friend, that he intended to investigate the matter. Two weeks later, Ross was placed on indefinite administrative leave. No further investigation of St. John's complaint occurred.

St. John filed this civil action in federal district court, seeking damages for false arrest, false imprisonment, and sexual assault under the FTCA, 28 U.S.C. § 2671 et seq. The case proceeded to a bench trial. Upon review of the evidence, the district court found that Coleman was acting within the scope of his employment at the time of St. John's release from jail. St. John v. United States, No. CIV 97-3051 at 24. In addition, the district court awarded St. John $3,000 in damages on the false arrest and false imprisonment claims. However, the district court refused to reach the question of sexual assault, deciding that the sexual incident occurred outside Coleman's scope of employment, and therefore the district court lacked jurisdiction under the FTCA. Id. at 33. This appeal followed.

**Discussion**

FTCA Scope of Employment

St. John argues that Coleman, acting within the scope of his employment, abused his authority as a BIA police officer to sexually assault her. She contends that she was the victim of a continuing tort because Coleman never completely relinquished his power to arrest and detain her, and used that power to force her to enter his truck so that he could rape her. The government claims that Coleman was not holding St. John in custody or performing law enforcement functions at the time of the alleged rape, so that the connection between Coleman's employment and the sexual incident was too remote and tenuous to be foreseeable, and thus attributable, to the employer. The government also asserts that Coleman's alleged sexual assault could not have been within the scope of his employment as a BIA police officer because such conduct clearly violates public policy and conflicts with the job Coleman was expected to

perform. The standard of review for the scope of employment analysis is unsettled. In this court's most recent decision regarding the scope of vicarious liability under FTCA, Primeaux v. United States, 181 F.3d 876, 881-82 (8th Cir. 1999) (en banc) (Primeaux II), it was unnecessary to resolve whether scope of employment is a question of fact to be reviewed for clear error or a mixed question of law and fact to be reviewed *de novo*. The Supreme Court has not clearly decided the issue. Although the Supreme Court categorized scope of employment as the "determination of a fact" in Gutierrez De Martinez v. Lamagno, 515 U.S. 417, 424 (1995) (evaluating the legitimacy of a scope-of-employment certification under the Westfall Act), a more recent decision concluded that where "there is a genuine question about the employer's responsibility for harmful conduct he did not in fact authorize, a holding that the conduct falls within the scope of employment ultimately expresses a conclusion not of fact but of law." Faragher v. City of Boca Raton, 524 U.S. 775, 796 (1998) (determining vicarious liability under Title VII). Like Primeaux II, in the present case, we need not decide whether to apply a clearly erroneous or a *de novo* standard of review to the scope of employment issue in a FTCA claim.

The FTCA is a limited waiver of sovereign immunity, allowing the federal government to be sued for the actions of "any employee of the Government while acting within the scope of his office or employment" under circumstances where the United States would be liable if it were a private employer. 28 U.S.C. § 1346(b) and 2674. Scope of employment is generally determined by the law of the state where the tort occurred. See Brown v. Armstrong, 949 F.2d 1007, 1012 n.7 (8th Cir. 1991) (Brown). However, FTCA claims are strictly limited to a scope of employment analysis, regardless of state law doctrines of respondeat superior and apparent authority. Primeaux II, 181 F.3d at 878 (holding that apparent authority, as a separate theory of vicarious liability, should not be considered in FTCA claims).

The applicable law in this case is the law of South Dakota. See Brown, 949 F.2d at 1012 n.7 ("[u]nder the FTCA, the law of the place of the alleged tort governs the

scope-of-employment question"). Under South Dakota law, the scope of employment inquiry is based upon a foreseeability test that evaluates whether a sufficient nexus exists "between the agent's employment and the activity which actually caused the injury." Leafgreen v. American Family Mutual Insurance Co., 393 N.W. 2d 275, 280 (S.D. 1986) (Leafgreen). In addition, South Dakota has adopted the Restatement (Second) of Agency (1958), including § 229, which focuses on the relationship of the employee's conduct to the employer's business. See Deuchar v. Foland Ranch, Inc., 410 N.W.2d 177, 180 (S.D. 1987) (Deuchar) (holding that South Dakota is guided by the principles articulated in the Restatement (Second) of Agency, including § 229). The Restatement also provides a list of factors to consider in determining whether conduct is "of the same general nature as that authorized, or incidental to the conduct authorized" by an employer so that it falls within the scope of employment. See id. at 180-81 n.2 (citing the Restatement (Second) of Agency § 229, including the following factors to include in the scope of employment analysis: whether the act is commonly done in the course of business; the time, place, and purpose of the act; whether the act is within the enterprise of the master; the similarity of the act done to the act authorized; whether the means of doing harm has been furnished by the master; and the extent of departure from the normal method of accomplishing an authorized result). Generally, the "act of an employee done to effect some independent purpose of his own is not within the scope of his employment." United States v. Lushbough, 200 F.2d 717, 720 (8th Cir. 1952). Nor is conduct that is "so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business" considered within the scope of employment. Id. at 280-81.

This court has applied the South Dakota foreseeability test in Red Elk v. United States, 62 F.3d 1102 (8th Cir. 1999) (Red Elk) (citing Leafgreen), and in Primeaux II. In Red Elk, an armed, uniformed Tribal police officer in a patrol car, accompanied by another officer, stopped to pick up a thirteen-year-old girl walking alone at night for curfew violation and then raped her in the back seat of the car. Applying the Leafgreen test, this court found that the officer's conduct was foreseeable because there was an

obvious nexus between the officer's conduct and his employment.  Red Elk, 62 F.3d at 1106.  We relied on South Dakota cases which emphasized the unique position of trust police officers hold in our society, as well as their inherent ability to abuse the public trust.  Id. at 1106-07.  We further observed that sexual misconduct by police officers is a known risk of law enforcement.  Id. at 1106.

In Primeaux II, a Tribal officer returning from a work-related seminar, driving a recognizable police vehicle, stopped to offer a ride to a young woman whose car was stuck in a snowbank and then raped the woman.  We found that, although "it is sufficiently foreseeable to a government employer that on-duty police officers will occasionally misuse their authority to sexually assault detainees," the officer's conduct in that case was not foreseeable because the officer was acting in the capacity of an individual citizen, not a police officer.  Primeaux II, 181 F.3d at 882.  As a result, we held that his conduct was too remote and tenuous to be foreseeable to his employer, therefore falling outside the scope of his employment.

In the present case, the government urges us to read Primeaux II as limiting the scope of employer liability for FTCA claims to include only employee conduct explicitly condoned by the employer.  We think the government's interpretation is inconsistent with the text and purpose of the FTCA.  See 28 U.S.C. § 2674 n.21 (stating that the purpose of the FTCA is to "reflect strong public policy to protect citizenry from torts committed by public servants" and "to adopt respondeat superior as it is understood in law of the states"); see also Red Elk v. United States, 62 F.3d at 1108 (remarking that imposing "justified liability" on federal officers who abuse their positions of authority "may help improve hiring and supervision and produce a police force fully worthy of the public trust").  We decline to interpret the FTCA so narrowly.  To do so would seriously undermine the purpose of imposing FTCA liability for police officer misconduct made possible only by virtue of employment authority.

Moreover, it is inconsistent with South Dakota law, which imposes liability for police misconduct that is sufficiently related to the officer's employment. See Leafgreen, 393 N.W. 2d at 280.

The district court neglected to find whether Coleman did in fact threaten St. John with re-arrest to compel her to enter his truck. Without knowing whether Coleman threatened St. John with arrest, it is impossible to determine whether he was acting within the scope of his employment. Under Primeaux II, we must focus on whether the conduct "is based upon the employment relationship." 181 F.3d at 881. Coleman's misconduct may have been related to his employment if Coleman did force St. John to enter his truck under threat of arrest. The existence of Coleman's threats would weigh heavily in a Leafgreen evaluation of whether a sufficient nexus existed between Coleman's employment and the activity that caused the injury. Because the duty to arrest is a police officer's normal employment responsibility, the activity causing the injury would be related to Coleman's employment as a BIA police officer. Only a police officer would have the ability to utilize the threat of arrest to coerce a civilian into unwillingly accompanying him. Unlike the officer in Primeaux II, Coleman could not have been acting within an individual civilian capacity by making such a threat. No ordinary citizen possesses the ability to carry out a threat to arrest. On the contrary, the effectiveness of Coleman's threat to arrest St. John depended entirely upon his ability to fulfill it -- an ability within the foreseeable scope of his employment.

The BIA's disapproval of Coleman's misconduct does not preclude FTCA liability. See Deuchar, 410 N.W.2d at 180 ("'The fact that the servant's act is expressly forbidden by the master, or is done in a manner which he has prohibited . . . is usually not conclusive, and does not in itself prevent the act from being within the scope of employment.'" (quoting Prosser and Keeton on the Law of Torts § 70 at 502 (5th ed. W. Keeton 1984))). Rather, the record suggests that Coleman's co-workers not only could foresee, but were actually aware of, Coleman's misconduct regarding St. John's initial false arrest. Rio Owen, the dispatcher on duty, testified that Coleman remained

in uniform and wore his badge, contrary to police custom, and that he believed that Coleman had authority to arrest St. John regardless of whether he was on-duty. Coleman's off-duty status is not dispositive, because he retained the power to perform discretionary police functions, such as arresting and releasing St. John from jail, even when he was officially off-duty.  See Primeaux II, 181 F.3d at 882 (distinguishing an officer who was potentially on-duty from an officer who was off-duty "insofar as his law enforcement responsibilities were concerned" and outside his jurisdiction, for purposes of  FTCA liability).  Given Coleman's prior actions, his retained power to perform discretionary police functions while off-duty, including the power to arrest and release,  and his proximity to the police station, the BIA certainly could have predicted that Coleman might again abuse his position of authority as a police officer.

Because the district court failed to complete the scope of employment analysis, we reverse in part and remand the case to the district court for further findings and proceedings consistent with this opinion.

Sufficiency of the Damage Award

St. John argues that the district court abused its discretion in granting her an award of $3,000 for false arrest and false imprisonment because it relied on outdated and inconsistent assessments of similar tort damage awards.  The district court based its decision on three cases: Thurman v. Cundiff, 580 P.2d 893 (Kan. 1978) (awarding the plaintiff $15,000 for false arrest and a two-hour detention in jail); City of Evansville v. Cook, 319 N.E.2d 874 (Ind. 1974) (awarding the plaintiff $4,250 for a two-hour detention in a store); and Nelson v. R.H. Massey & Co., 434 S.W.2d 767 (Mo. 1968) (awarding the plaintiff $2,500 for a three-hour detention).  The government contends that the district court properly exercised its discretion in considering prior case law and the specific details of the case.

Because "inadequacy . . . of the verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards," Solomon Dehydrating Co. v. Guyton, 294 F.2d 439, 447 (8th Cir. 1961), we must defer to the district court's assessment of damages unless there is "'plain injustice' or a 'monstrous' or 'shocking' result." Id. at 448. As a result, we review the district court's determination of the damage award for abuse of discretion. See Gasperini v. Center for Humanities, 518 U.S. 415, 434-35 (1996) (holding that appellate courts should review district court determinations of the adequacy of damage awards under an abuse of discretion standard). In addition, the FTCA grants broad discretion to the district court, declaring that the "standard of review of damages award is whether district court erred in its interpretation and application of state law." 28 U.S.C. § 2674 n.32. There is no indication in the present case that the district court misinterpreted or misapplied South Dakota law. Rather, the district court correctly considered prior case law and the circumstances of this case, and made sufficiently detailed findings to support its conclusions.

Furthermore, the district court correctly noted that its authority to award damages was limited by the FTCA, which only allows compensatory damages. St. John v. United States, No. CIV 97-3051 at 34 (citing FTCA, 28 U.S.C. § 2674); see 28 U.S.C. 2674 n.22 ("damages are determined by law of state where the tortious act was committed, subject to limitations that United States shall not be liable for. . . punitive damages"). The district court awarded $3,000 in compensatory damages based on St. John's discomfort and inability to sleep while in custody, even though bunks, a bathroom, and a sink were available in the cell. Id. at 35. The district court found no credible evidence of physical injuries and could not award damages for mental or emotional suffering under South Dakota law. Id. at 34 (citing Nelson v. WEB Water Development Assoc., Inc., 507 N.W.2d 691, 698-99 (S.D. 1993) (holding that under South Dakota law, compensation for "negligent infliction of emotional distress requires manifestation of physical symptoms" and intentional infliction of emotional distress

-11-

requires "an extreme disabling emotional response")). Nothing in the record suggests that St. John suffered any physical injuries or a disabling emotional reaction as a result of her false arrest and false imprisonment.

For these reasons, we hold that the district court did not abuse its discretion and affirm the district court's damage award for the false arrest and false imprisonment claims.

## Conclusion

For the reasons we have stated, we affirm in part and reverse in part and remand the case to the district court for further proceedings consistent with this opinion.

A true copy.

     Attest:

       CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.