62 F.3d 1102
 Rodger RED ELK, Guardian Ad Litem on Behalf of His Minor
Daughter, Melinda RED ELK, And His Minor
Grandchild, Taylor Red Elk,
Appellee/Cross-Appellant,
v.
UNITED STATES of America, Appellant/Cross-Appellee.
 Nos. 94-3102, 94-3194.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 18, 1995.
Decided Aug. 15, 1995.
 
 Gregory G. Strommen, Rapid City, SD, argued (Dennis H. Hill, on the brief), for appellant/cross-appellee.
 Scott D. McGregor, Rapid City, SD, argued (Terry L. Pechota, on the brief), for appellee/cross-appellant.
 Before RICHARD S. ARNOLD, Chief Judge, WOOD, Jr.* , Senior Circuit Judge, and FAGG, Circuit Judge.
 HARLINGTON WOOD, Jr., Senior Circuit Judge.
 
 
 1
 This case arises under the Federal Tort Claims Act of 1948, 28 U.S.C. Sec. 2671 et seq. and Sec. 1346 [FTCA], for damages resulting from the rape of Melinda Red Elk, then a child thirteen years of age, by Charles Claymore, a tribal police officer for the Pine Ridge Indian Reservation in South Dakota.[1] In a bench trial in June 1994, the court found the government liable and assessed damages at $100,000. The government appeals. The victim had become pregnant and a son, Taylor Red Elk, was born to her fathered by Claymore. The district court denied plaintiffs' additional claim for damages for reasonable child raising and child care expenses. Plaintiffs cross-appeal.[2]
 
 FACTS
 
 2
 There is no question that the rape did in fact occur. Claymore was convicted in a jury trial of sexual abuse of a minor in violation of 18 U.S.C. Secs. 1153 and 2243(a), and sentenced to five years imprisonment and supervised release of three years. The case was affirmed on appeal.[3]
 
 
 3
 As was found by the district court, Claymore's sexual relationship with the thirteen year old victim began one night in 1989. Claymore was in his officer's uniform, armed and driving a patrol car accompanied by a fellow officer, Tim Zimiga. They saw the victim walking alone along the road about ten or eleven o'clock at night. They stopped, and Claymore instructed her as a curfew violator to get into the back seat of the police car, which she did. The back seat purposefully had no door handles on the inside. It appears the victim had been taken home for curfew violations before, but this time on the way home she was raped by Claymore in the back seat of the police car. At that time Officer Zimiga got out of the police car and waited, but did nothing to stop the commission of the crime by his fellow officer. In fact after Claymore had finished with the victim, the evidence revealed Zimiga asked the victim if it was now his turn. The victim declined. Zimiga, however, was never charged. At trial the victim explained the force Claymore used on her. After this encounter the officers drove the victim home. It was police policy and part of the duties of tribal police to pick up minors, male or female, for violating the curfew and take them to their homes if they were not intoxicated, in which case other rules applied. The victim here had not been drinking. The curfew hours were nine o'clock on week nights and ten o'clock on weekends.
 
 
 4
 Five more incidents of intercourse by Claymore with the victim followed in about the same pattern except, it appears in some instances the victim voluntarily submitted with no force from Claymore. Two of the rapes, however, were at Claymore's home and one in a rural area. The victim finally put an end to the relationship without any additional trouble from Claymore.
 
 
 5
 The court found that Claymore had been hired in 1988, without having had any prior police experience. He had a history of alcohol abuse and treatment and a number of misdemeanor convictions. At that time a case was pending against him, but only for an insufficient funds check. As part of his hiring he was not given any psychiatric or aptitude tests. After being hired it is conceded that he did not receive the required formal training as a police officer, only what he learned from other officers. It is also suggested in the evidence that no full background investigation was done on Claymore as federal regulations required, 25 C.F.R. Sec. 11.304(i). It also appears in the testimony that his hiring was more for political reasons than for merit. Evidence also showed that Claymore brought pornographic magazines to work, and sometimes included inappropriate sexual references in his reports. Shortly before this incident he received a poor evaluation from his superiors.
 
 
 6
 The victim's father, Rodger Red Elk, began this action for damages as guardian ad litem on behalf of his minor daughter, Melinda Red Elk, the victim, and also on behalf of his minor grandchild, Taylor Red Elk.
 
 Analysis
 
 7
 The government argues that the government cannot be liable for the rape and pregnancy because both Claymore's and Zimiga's wrongful acts were outside the scope of their police employment. The government also claims there can be no liability for the negligent hiring and supervision of Claymore, and further asserts that damages are not justified. The victim's cross-appeal asks for additional damages for the expenses of raising and caring for the child born as a result of the crime.
 
 
 8
 The law of South Dakota, it is agreed by all parties, controls the determination of whether Claymore's actions were within the course and scope of his employment as a tribal law enforcement officer. However, both parties rely to some extent on cases from other jurisdictions. Referring to the sources of cases cited to this court by the plaintiff, the government points out that while the plaintiff criticizes the government for citing a "multitude" of cases from elsewhere, the plaintiff also relies primarily, not on South Dakota cases, but on the courts of California and Louisiana. Plaintiff does argue in his brief that the most compelling authorities respecting the conduct of the officers are Mary M. v. City of Los Angeles, 54 Cal.3d 202, 814 P.2d 1341, 285 Cal.Rptr. 99 (1991), and Applewhite v. City of Baton Rouge, 380 So.2d 119 (La.Ct.App. 1st Cir.1979). However, in the next paragraph plaintiff argues that the "South Dakota law on scope of employment is well settled." While criticizing the source of the citations of the other, each party has the same problem in trying to find adequate support under South Dakota law. That problem is now ours. As the Supreme Court of South Dakota recognized in Skow v. Steele, 74 S.D. 81, 86, 49 N.W.2d 24, 26 (1951), "[t]he cases on the subject are legion, and each is dependent upon the peculiar fact situation presented." That court concluded that a discussion of all the cases would not be helpful. We concur. We shall first examine the South Dakota cases for guidance in the fact situation we confront.
 
 
 9
 The government argues in compelling logic that this clearly was Claymore's personal frolic. The rape could not possibly be within the scope of his employment. Consequently, the government as the employer cannot be liable. It is, however, not that simple to resolve the issue in the factual circumstances of this case under the law of South Dakota.
 
 
 10
 The district court made findings of law and fact, but did not cite any precedent in South Dakota or elsewhere. We assume the district court, being familiar with the law of South Dakota, had in mind the South Dakota cases cited to us by the parties. We shall examine those cases.
 
 
 11
 In Skow v. Steele, the South Dakota Supreme Court affirmed the liability of the owner of a farm for an assault committed by his agent upon a tenant farmer. Skow, 49 N.W.2d at 26. The dispute arose from an on-going controversy over division of the corn crop between owner and tenant. Id. The tenant resisted, permitting corn remaining in the field to be combined by the landlord's agent. Id. The agent persisted and assaulted the plaintiff-tenant. Id. The court affirmed and held that the evidence was sufficient to show that the assault was within the scope of the agent's employment. Id. The master-owner was therefore found liable for the assault and battery of his agent upon his tenant.
 
 
 12
 In Leafgreen v. American Family Mut. Ins. Co., 393 N.W.2d 275 (S.D.1986), the leading South Dakota case, there is another distinctive fact situation involving insurance. The insured-plaintiffs brought a case against their insurer for damages stemming from the wrongful acts of the insurer's agent. Id. at 276. The agent used his friendship and access to plaintiffs' home to learn where they kept their valuables. Id. Collaborating with burglars, the agent gave that information to the burglars to enable them to break in and steal the valuables. Id. The South Dakota Supreme Court held that the insurer was not vicariously liable to its insureds for these acts of its agent. It applied a "nexus" test between the insurance agent's conduct and his employment duties and found the nexus was not adequate. Id. at 280-81. The court found the particular act of the agent was not sufficiently "foreseeable" so that it would be unfair to assess the loss against the insurer-principal. Id.
 
 
 13
 In Deuchar v. Foland Ranch, Inc., 410 N.W.2d 177 (S.D.1987), another unique factual scenario is presented. A ranch hand, acting as an agent of the ranch owner but without the required specific authority of the owner on this occasion, was guiding a party of deer hunters on the ranch. Id. at 179. The ranch hand agent mistook one of the parties to be a wounded deer and mistakenly shot the hunter in the leg. Id. The wounded hunter sued the ranch owner. Id. The trial court granted summary judgment for the ranch owner holding the ranch hand was not acting within the scope of his employment when he shot the hunter plaintiff. Id. at 180. The South Dakota Supreme Court reversed for the owner and remanded the case for trial on the factual issue of the scope of the agent's employment even though it was clear that the agent was not authorized to shoot the hunter. Id. The court applied and interpreted Leafgreen to reach that result.
 
 
 14
 In Olson v. Tri-County State Bank, 456 N.W.2d 132, 133 (1990), a bank customer claimed embezzlement by an agent of the bank. The Supreme Court of South Dakota again set forth the rule, citing Leafgreen.
 
 
 15
 The Bank claims it is not vicariously liable for the alleged fraud of Pulse [the bank's agent] because Pulse was acting solely for his own benefit when he fraudulently completed the notes. A principal is not automatically discharged from liability for fraud committed by an agent simply because the agent acts solely to benefit himself. Leafgreen v. American Family Mut. Ins. Co., 393 N.W.2d 275 (S.D.1986). Whether a principal will be held liable for the conduct of an agent is determined by the nexus between the agent's employment and the activity which actually caused the injury. Id. Liability will be imposed upon the principal when the nexus is sufficient to make the resulting harm foreseeable. Id. In other words, if the agent's employment puts him in a position where his harmful conduct would not be "so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business," then the principal is liable for the injury. Id. at 280-1.
 
 
 16
 Id. at 135. The court went on to hold that the facts of the case warranted imposing vicarious liability upon the Bank, explaining that it was far from unusual or startling that a bank employee would use his position to misappropriate money. Id.
 
 
 17
 This court has previously reviewed the South Dakota law of vicarious liability in Davis v. Merrill Lynch, 906 F.2d 1206 (8th Cir.1990). That case involved fraud by an account executive of the defendant, who churned the plaintiff's account with numerous unauthorized trades. Id. at 1210. Leafgreen was applied in affirming an award of damages for the plaintiff. Id. at 1222. Davis and Olson may seem at first to be in possible conflict with another decision of this court, United States v. Lushbough, 200 F.2d 717 (8th Cir.1952), in its interpretation of South Dakota law, but they are not. In Lushbough it was held that if the harm comes from some independent purpose of the agent then the principal is not liable. Id. at 720. That is further explained, however, by holding that the principal is not liable if the agent is engaged "exclusively" in his own affair though the agent was using some instrument of the principal. Id. at 720-21. In Lushbough the agent borrowed the principal's vehicle to run a purely personal errand unconnected with the principal and had an accident. Id. at 719. The principal was held not liable for damages resulting from that accident. Id. at 721. There is more in our present case, however, than just using the police vehicle.
 
 
 18
 We believe there is sufficient guidance in South Dakota law for the fact circumstances we face, but we will look briefly at cases from other jurisdictions as in each a rape was involved. In Mary M. v. City of Los Angeles, 54 Cal.3d 202, 814 P.2d 1341, 285 Cal.Rptr. 99 (1991), the Supreme Court of California held the city liable for the rape of the plaintiff by one of its police officers considered to be acting within the scope of his employment. Liability was found even though the officer violated his official duties, disregarded the city's express orders, and the city had taken several steps to prevent such misconduct. The court first explained that the police occupy a unique position of trust in our society, and commented that even though this sexual conduct by an officer is uncommon it nevertheless is a risk broadly incidental to law enforcement. Id. 285 Cal.Rptr. 99, 108, 814 P.2d at 1341, 1350. The court did not agree that the officer's conduct was so unusual and startling that it did not meet the scope of employment test. Id. at 108, 814 P.2d at 1350. The court further explained that since police officers have been entrusted with enforcing the law they act with state authority. Id. at 107, 814 P.2d at 1349. "Inherent in this formidable power is the potential for abuse", the court explained, and "[t]he cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power." Id. In Beliveau v. Caras, 873 F.Supp. 1393, 1399 (C.D.Ca.1995), involving a sexual battery charge, and not rape, the district court following Mary M., explained that even "[t]ortious acts that do not benefit the employer or are willful or malicious in nature may still be within the scope of employment."
 
 
 19
 In Applewhite v. City of Baton Rouge, 380 So.2d 119 (1979), a Louisiana Court of Appeal held the city liable for the police officer's rape of a woman whom the officer picked up in his patrol car for alleged vagrancy. That court commented that:
 
 
 20
 A police officer is a public servant given considerable public trust and authority. Our review of the jurisprudence indicates that, almost uniformly, where excesses are committed by such officers, their employers are held to be responsible for their actions even though those actions may be somewhat removed from their usual duties. This is unquestionably the case because of the position of such officers in our society.
 
 
 21
 Id. at 121.
 
 
 22
 There is no reasonable way for us to pursue this vicarious liability issue in the various jurisdictions by examining a multitude of cases which depend on their unique facts. We will apply South Dakota law to the unique facts of this case and as we interpret South Dakota precedent. "Foreseeability" is central to the analysis under the South Dakota rule stated in Leafgreen. Leafgreen, 393 N.W.2d at 280-81. As part of their employment as policemen, Claymore and Zimiga were responsible under the reservation curfew policy for the safe return to their homes of minors who were violating the curfew. These two officers on duty, in uniform, armed, and patrolling in a marked police car, picked up the victim ostensibly to return her safely home as a curfew violator. She got in the rear seat of the patrol car from which she had no way to exit without the officers' help. On the way home Claymore got in the back seat and raped her. Zimiga discreetly got out of the car and looked the other way, but made a timely return to the patrol car to inquire if it was now "his turn." It was not, so the officers finally took the victim home. The nexus is obvious. It was a blatant violation of trust, particularly when involving a minor.
 
 
 23
 In our view it was also foreseeable that a male officer with authority to pick up a teenage girl out alone at night in violation of the curfew might be tempted to violate his trust. Claymore had that opportunity because of his employment, the trappings of his office, and the curfew policy he was to enforce. He and Zimiga enforced the curfew policy, but violated the minor in the process.
 
 
 24
 The record reveals that Claymore brought pornographic magazines to work and made inappropriate sexual responses in his reports. Sex between police officers and those in their custody is not common as far as the cases reveal, but it does occur. Mary M. informs us that the Los Angeles Police Department has specific rules about a male officer transporting a female in a police vehicle. The rules are intended to discourage the officer's improper behavior. For a good police officer, trained and professional in his public trust work, that type of specific rule should not be necessary, but it is apparently believed to be necessary for the few. Cases like this stigmatize respected police officers who in rendering vital public work surely outnumber the errant officers. That does not mean, however, that in some circumstances, as in the present case, this type of sexual misconduct by an officer is not reasonably foreseeable for vicarious liability purposes.
 
 
 25
 We will not recognize a separate cause of action for the alleged negligent hiring of Claymore by the government as plaintiff urges, because of the "discretionary function" exception to the FTCA, 28 U.S.C. Sec. 2680(a).[4] The evidence of the hiring and training process of Claymore, however, at least raises the prospect; in other words, the foreseeability that some new untrained and undisciplined officers may commit acts trained professional officers would not.
 
 
 26
 Zimiga also failed in his police duties by failing to prevent the commission of Claymore's crime or in failing to arrest Claymore for the crime committed in his presence. In the course of police work it is foreseeable that one officer working closely and regularly with another officer, no doubt friends and dependent to some extent on each other, may not do his duty in regard to the other officer. In fact, Zimiga was apparently intending to follow Claymore's bad example, but the victim was not willing. Here there were two officers in a small police force in this small area of South Dakota, who were willing to commit a sexual crime, and one did. For sexual misconduct on occasion by some officers not to be sufficiently foreseeable to impose vicarious liability would suggest that those in charge are blind to modern reality. It is neither so startling nor so unfair as to permit the government in these circumstances to escape liability.
 
 
 27
 This type of justified liability, hopefully, may help improve hiring and supervision, and produce a police force fully worthy of the public trust. It cannot be otherwise. We believe this would be the enlightened view of the Supreme Court of South Dakota as we view precedents.
 
 
 28
 The damages found due by the district court are fully justified. That this minor victim's present and future life would not be adversely affected by the police offense does not merit discussion. The court's factual findings in all regards, not being clearly erroneous, deserve to be sustained. The damages are fair and reasonable. There was no error, however, in denying additional damages claimed for child raising and child care expenses. The liability of the government under the Federal Tort Claims Act is for causes sounding in tort, not in equity. Howell v. United States, 932 F.2d 915, 917 (11th Cir.1991). The claim for those expenses must be brought elsewhere than against the government.
 
 
 29
 AFFIRMED.
 
 
 
 *
 The Hon. Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 The United States is named as defendant pursuant to the Federal Tort Claims Act of 1948, 62 Stat. 982, 28 U.S.C. Secs. 1346(b), 2671 et seq., and P.L. 101-512 (1990). The Oglala Sioux Tribe on the reservation, its Public Safety Commission, and the Public Safety employees are deemed to be part of the Bureau of Indian Affairs, a federal agency in the executive branch, for purposes of the Act, but only while its employees are acting within the scope of their employment
 
 
 [2]
 In accordance with 28 U.S.C. Sec. 2675, the plaintiff first filed a claim for an administrative settlement with the Bureau of Indian Affairs in the amount of two million dollars. The claim was denied in 1992 and followed by this suit within six months as authorized by statute
 
 
 [3]
 United States v. Claymore, 978 F.2d 421 (8th Cir.1992). Claymore only appealed his sentence although at trial he denied sexual contact with the victim. His sentence was enhanced under the Sentencing Guidelines on the basis of his abuse of a position of trust as a police officer. The court noted that the rapes occurred after Claymore had picked up the victim for curfew violations and raped the victim in the patrol car. Id. at 423. His sentence was further enhanced by Claymore's perjured testimony at trial. Claymore's ten previous misdemeanor convictions in tribal court further served to increase his sentence. Claymore's sentence was also given an upward departure because of the aggravating circumstances not taken into consideration by the Sentencing Commission, namely because there had been several acts of sexual abuse and not just one as was charged in the indictment
 
 
 [4]
 Section 2680(a) provides an exception to the government's liability when in "the exercise or performance or the failure to exercise or perform a discretionary function." (Emphasis added). The hiring and selection of an employee is a discretionary function of the government-employer. It is a matter based on its own judgment