**Harvey BROWN, Jumal Frazier, Jason Johnson, Edward James Warner, by and through Colleen Warner, his Guardian ad Litem, Steve Higdem, by and through Doreen Mahoney, his Guardian ad Litem, Jesse Eliason, by and through Diane Bergland, his Conservator, Plaintiffs,**

v.

**YOUTH SERVICES INTERNATIONAL OF SOUTH DAKOTA, INC., d/b/a Chamberlain Academy, Defendant.**

No. Civ 98–4165.

United States District Court,
D. South Dakota,
Southern Division.

March 15, 2000.

Steven M. Johnson, Johnson, Heide-priem, Miner, Marlow & Janklow, Sioux Falls, SD, Gregory N. McEwen, McEwen Law Firm, Minneapolis, MN, for plaintiffs.

Edwin E. Evans, Cheryle Wiedmeier Gering, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Defendant, Youth Services International of South Dakota, Inc. ("the Academy"), has filed a motion for summary judgment on each count of a complaint which alleges that the Academy is liable for the sexual abuse, molestation, and exploitation committed by its former employee, James Johnson. Plaintiffs have also filed a motion to allow the jury to consider punitive damages. For the reasons stated below, the Academy's motion for summary judgment is granted in part and denied in part, and plaintiffs' motion to proceed at trial regarding punitive damages is granted.

## BACKGROUND

The Academy does business in South Dakota under the name Chamberlain Academy, providing "residential and other rehabilitative programs for troubled juveniles and young adults." A majority of the children and young adults who reside at the Academy are placed there by state courts, state departments of correction, and the Federal Bureau of Prisons. Each of the six plaintiffs is from a state other than South Dakota, and, during the relevant times discussed below, each of them was a resident at the Academy pursuant to a juvenile court order.

James Johnson was a counselor at the Academy from July 1995 through late January or early February 1996. Before Johnson was hired, he had to provide three references and submit to a background check. When asked how Johnson would handle adolescents, one of Johnson's references wrote, "Not sure." The Academy did not follow up on that response, and the summary judgment record does not disclose what the Academy might have learned if it had followed up. The other two answered, respectively, "Good," and "Yes." The background check, which was performed by the South Dakota Department of Social Services, Office of Child

Protection Services, checked South Dakota's Central Registry of Child Abuse/Neglect, and did not turn up any "substantiated report of abuse or neglect as defined by the department by rule." The background check did not find Johnson's name on the Texas Central Registry of Child Abuse/Neglect, either.

According to plaintiffs, Johnson sexually assaulted, molested and exploited them during his tenure at the Chamberlain Academy. Plaintiffs claim that Johnson performed most of his sexual misconduct when he entered their bedrooms during room checks at night, and in spite of the Academy's "no [physical] contact" and "no one-on-one meetings" policies. It was there, plaintiff Jason Johnson says, that the counselor massaged his back as a prelude to rubbing his rear end and touching his penis. Plaintiff Jesse Eliason stated that Johnson gave him numerous back rubs and once grabbed his penis, and that he saw Johnson inappropriately touching other plaintiffs in the shower. Plaintiff Harvey Brown stated that, despite the Academy's policy against staff members taking residents home, Johnson took Brown to his home where he sexually assaulted Brown by giving him a back rub and touching his rear end. Plaintiff Jumal Frazier says that Johnson engaged in an escalating series of sexual assaults over a period of time, starting with touching Frazier's penis, moving to mutual masturbation, and ending with oral and anal sex. Plaintiff Edward Warner claims that Johnson would grab the inside of his leg when Warner approached Johnson at his desk to ask a question, and that Johnson rubbed his back and butt on two occasions. Plaintiff Steve Higdem says that, on one occasion, Johnson rubbed his chest and quadriceps under the sheets of his bed. For his part, counselor James Johnson denies any inappropriate behavior toward any of the plaintiffs.

In late January 1996, approximately eight months after he was hired, Johnson's alleged sexual misconduct resulted in a report to the Chamberlain Academy staff. Plaintiff Steve Higdem made the initial report to Renae Santana, another counselor at the Academy, a few days after Johnson rubbed Higdem's chest and legs. (The summary judgment record does contain the exact date of Higdem's report.) In his conversation with Santana, Higdem referred to Johnson as "Chester the Molester." When Santana asked Higdem what he meant, Higdem replied that he thought he was gay, and that he thought Johnson was gay. At this point, Santana cut the conversation off, and told Higdem that his statement would have to be reported to his team leader, Gerald Barnett. In the meantime, Santana reported the statement to Barnett herself.

The day after Santana's conversation with Higdem, Barnett received the following unsigned letter:

Dear Mr. Barnett:

I am leaving this on the floor so you don't know who this is because I'm to [sic] hurt inside, cause I am scared of Mr. Johnson feeling up on me (boy). And I have seen Mr. Johnson feeling up Rashod.

If you do find out who this is please don't tell the group. I am not doing this to get out either. So I would appersiyate [sic] it if you wouldn't say I did this to get him in trouble or when I'm doing good when I go for the next level your team wouldn't hold it against me.

Barnett suspected that the note was from Higdem, and called Higdem into his office, where Higdem personally reported the incident to Barnett. Although Barnett did not believe Higdem, he placed Johnson on leave, and alerted the Department of Social Services. That same day, Higdem ran down the hallway yelling, "the motherfucker felt me up." (Eliason Dep. at 64.) Based on the advice of the Department of Social Services, Johnson was not allowed to return to work at the Academy, and was eventually dismissed.

Johnson was later charged with two counts of abuse of or cruelty to a minor, SDCL 26–10–1, in connection with his conduct toward Jumal Frazier and Steve Hig-

dem, and one count of simple assault, in connection with his conduct toward Jumal Frazier. The charges of abuse of or cruelty to a minor were dropped, and Johnson pleaded no contest to the charge of simple assault.

The parties dispute the extent to which the Academy staff knew about or suspected Johnson's sexual misconduct before he was dismissed. While plaintiffs state that Barnett received several complaints of sexual misconduct, most of those complaints were made the day before Johnson was dismissed, apparently as the result of Hidgem's note to Barnett. While their depositions do not use exact dates, two of the students apparently claim that they reported being abused some time before Johnson was dismissed. Harvey Brown says that he reported being abused to Barnett the day after the incident, when he was discharged from the Academy, but plaintiffs do not say what day that was. In December 1996, Brown filed a police report which states that the back rubbing incident took place in the fall of 1995, describing Johnson as a short, married man who walks with a limp and wears a beard. Jumal Frazier says that he told Barnett about Johnson fondling his penis but that Johnson continued to molest him and to escalate the level of the sexual assaults. Plaintiffs also base their claim that the staff new about Johnson's conduct on Jesse Eliason's testimony that he heard Santana say to another staff member about Johnson, "There's something wrong with this guy," and Barnett's admission that he had heard rumors that Johnson was a homosexual.

Plaintiffs claim to have suffered various emotional injuries as a result of Johnson's actions. According to the evaluations performed by plaintiffs' expert, Dr. Laura Ledray, their symptoms include depression, questions about their sexuality, intrusive and distressing thoughts about the molestation, feelings of numbness, detachment and estrangement, and sleep disturbances. In their depositions, plaintiffs testified that they suffered from embarrassment, difficulty allowing their girl-friends to touch them, depression, not trusting authority, and nightmares.

Plaintiff's Complaint contains seven counts against the Academy, five of which constitute independent causes of action. The Complaint alleges: (1) negligence in hiring, supervising and retaining Johnson as an employee; (2) negligent infliction of emotional distress; (3) intentional infliction of emotional distress; (4) assault and battery; and (5) failure to report child abuse. The complaint also contains "causes of action" asserting the applicability of Respondeat Superior and seeking the imposition of punitive damages. The plaintiffs have also filed a motion in support of punitive damages. For its part, the Academy argues both that it is immune from the alleged liability under state statute and that there is not enough evidence to establish any of the plaintiffs' causes of action. The Academy also argues that the record does not warrant punitive damages.

## DISCUSSION

■ Both plaintiffs' claims and the Academy's immunity defense raise questions of South Dakota state law. When this Court is applying South Dakota law under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and the South Dakota Supreme Court has not specifically addressed an issue, the Court must determine what the state supreme court would probably hold were it to decide the issue. *Farr v. Farm Bureau Ins. Co. of Nebraska,* 61 F.3d 677, 679 (8th Cir.1995). In resolving such questions, the Court may consider relevant state precedent, analogous decisions, scholarly works, and other reliable data. *See id.* These data include judicial decisions from other jurisdictions whose doctrinal approach to legal matters is substantially the same as South Dakota's and developing trends in the relevant field of substantive law. 19 Charles A. Wright, Arthur R. Miller & Edward E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 4507, at 195–200 (1996).

## A. Statutory Immunity From Liability

The Academy claims that it is immune from liability for plaintiffs' claims under the following statute:

> No person, political subdivision or the state is liable for failure to provide a prison, jail or penal or correctional facili-·ty, or if such facility is provided, for failure to provide sufficient equipment, personnel, programs, facilities or services in a prison or other correctional facility.

SDCL 3–21–8. Plaintiffs argue that this provision does not confer immunity on the Academy because the Academy is not a "person" within the meaning of the statute.[1] The Court agrees.

 The context of § 3–21–8 plainly requires that the term "person" be construed to exclude a private corporation such as the Academy. Under § 2–14–2, the term "person" must be construed to include "natural persons, partnerships, associations, and corporations" wherever it appears in the Codified Laws, unless its context plainly requires otherwise. SDCL 2–14–2(18). The context of § 3–21–8, however, makes clear that it was written to protect public entities and employees. The Academy correctly notes that the Court cannot consider the title of Chapter 21—"Public Entities and Officials"—as evidence of the Legislature's intent. See SDCL 2–14–9 (titles constitute no part of any statute). The Court should, however, consider the structure of Chapter 21 in the form in which it was passed, including, the content of sections which surround § 3–21–8. See SDCL 2–14–11. Chapter 21 begins by defining "public entities" and their "employees." SDCL 3–21–1.[2] The chapter then uses these definitions to provide procedural protections from lawsuits to public entities and their employees, see SDCL 3–21–2 through 3–21–6, and takes pains to guard the state's sovereign immunity, see SDCL 3–21–7, 3–21–10. In this context, it would be unreasonable to conclude that the Legislature intended to shield a private corporation such as the Academy from liability without explicit words to that effect.[3]

Extending immunity from liability to the Academy would also be plainly inconsistent with the policy goals of Chapter 21 in general and § 3–21–8 in particular. Chapter 21 was evidently written to protect South Dakota's public entities from lawsuits which interfere with their ability to perform their public functions, including their ability to attract and retain qualified employees. To that end, § 3–21–8 limits liability in cases involving public prisons, jails and other penal and correctional facilities. Extending that immunity to private persons, which, like the Academy·in this case, are providing correctional facilities and services to other states involves a subsidy to private industry rather than a protection of South Dakota state and local

---

1. Plaintiffs also argue that the Academy is not a correctional facility within the meaning of § 3–21–8, and that the statute is not "homogeneous" with their claims. Because the Academy is not a person under the statute, there is no reason to decide these questions.

2. As used in Chapter 21, unless the context plainly requires otherwise, the term "public entities" means:

> the state of South Dakota, all of its branches and agencies, boards and commissions. The term also includes all public entities in the state, including, but not limited to municipalities, counties, school districts, townships, sewer and irrigation districts and all other legal entities that public entities are authorized to establish.

SDCL 3–21–1(2).

3. It might make sense to conclude that the legislature intended the absolute limitation on liability in § 3–21–8 to apply to private correctional facilities, if it was operating on an historical assumption that private parties who provide correctional services to states are entitled to the same immunities as state employees who provide similar services. However, as the United States Supreme Court noted in *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), "there is no conclusive evidence of an historical tradition of immunity for private parties carrying out these functions." *Richardson*, 117 S.Ct. at 2104–05. *But see id.* (Scalia, J., dissenting) (providing some historical evidence for such a tradition).

government. It does not make sense to read such a subsidy into a Chapter of the Codified Laws whose primary purpose is to protect South Dakota's public entities.

The Academy argues that, by using the term "person" in § 3–21–8, the Legislature intended to extend the statute's protections to a broader class of persons than just public employees. Even if this argument is accepted as true, it does not follow that the Legislature intended to include the Academy within the protections of the statute. It might (or might not), for example, have intended to protect certain volunteers, a class of persons which explicitly received some protection from liability under the Act which contained § 3–21–8. *See* SL 1986, ch. 4 § 9 (codified at SDCL 20–9–4.1). In contrast, the Act gives no indication that it was intended to protect a private corporation such as the Academy, and thus no reason to conclude that the Academy is a "person" exempt from liability under § 3–21–8.

■ The state circuit court's decision in *Sorenson v. Missouri River Adolescent Development Center, Inc.*, CIV 92–86 (S.D. 1994) does not change this interpretation. State trial court decisions are not reported in South Dakota. While an opinion from a single state trial court provides some evidence of how the state supreme court might rule, it is not binding. *See Diesel Service Co. v. AMBAC Int'l Corp.*, 961 F.2d 635, 639 (7th Cir.1992), *overruled on other grounds by Generac v. Caterpillar Inc.*, 172 F.3d 971 (7th Cir.1999). In *Sorenson*, the state circuit court dismissed a complaint against the Academy's predecessor corporation which arose out of several students' escape from custody and subsequent damaging of private property. The circuit court held that the Academy was immune from liability under § 3–21–9, which, similar to § 3–21–8, states that "[n]o person ... is liable ... for any injury caused by ... an escaping or escaped person," reasoning that the Academy is a person under the general definition in § 2–14–2(18). As explained above, however, this interpretation is contrary to the context

and policy of Chapter 21 in general and § 3–21–8 in particular, and thus does not provide a reliable indication of how the South Dakota Supreme Court would interpret § 3–21–8.

**B. Plaintiffs' Claims Against the Academy**

Because § 3–21–8 does not protect the Academy from liability in this case, it is necessary to consider the Academy's motion for summary judgment on the individual counts of plaintiffs' complaint.

**1. Negligent Hiring, Retention, and Supervision**

The South Dakota Supreme Court has acknowledged that an employer can be held liable for the negligent hiring and supervision of an employee. *See Rehm v. Lenz*, 547 N.W.2d 560, 566 (S.D.1996). Plaintiffs and the Academy apparently agree that *Rehm* implicitly acknowledged the possibility of liability for negligent retention of an employee as well. Since the South Dakota Supreme Court has not set forth the elements of such claims, the parties rely heavily on the law of Minnesota to assess plaintiffs' ability to prove their case. In evaluating plaintiffs' evidence for these claims, the Court is not unmindful of the fact that interacting as an authority figure with troubled adolescent boys in a residential setting offers tantalizing opportunities to potential pedophiles. Because it was providing such an environment, the Academy assumed a high duty of care in hiring, retaining, and supervising Johnson.

**a. Negligent Hiring**

■ As articulated by the courts of Minnesota, negligent hiring is

the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of employment, it should have been foreseeable

that the hired individual posed a threat of injury to others. *Benson v. Northwest Airlines, Inc.,* 561 N.W.2d 530, 540 (Minn.App.1997). For an employer to be held liable for the conduct of an employee, the employee's harmful conduct must be consistent with the propensity of which the employer knew or should have known. *Marquay v. Eno,* 139 N.H. 708, 662 A.2d 272, 281 (1995).

Plaintiffs have presented some evidence that the Academy knew or should have known of Johnson's alleged propensity for sexually abusing children. Although the background check on Johnson, which was run by the state Department of Social Services at the Academy's request, did not reveal any propensity for any type of child abuse or neglect, the Academy did know that Johnson lacked any experience in counseling teenagers. Plaintiffs point out that the Academy's own Procedures for Identifying and Reporting Child Abuse/Neglect list "the caregiver's [lack of] knowledge of child management techniques (management of aggression, stages of child development, etc.)" as one of nine "[f]actors within the facility that may contribute to out-of-home care abuse and neglect." Given the statement by one of Johnson's references that she was "not sure" how Johnson would handle adolescents, the exercise of reasonable care arguably required the Academy to follow up on what amounted to a negative response from a reference, or to conduct a more thorough background check or other screening procedures to determine whether Johnson had a propensity for child sex abuse. There is thus sufficient evidence to show that the Academy should have known that Johnson posed a threat to abuse plaintiffs sexually.

### b. Negligent Retention

In order to support a claim for negligent retention, plaintiffs must show that the Academy was aware or should have become aware that Johnson posed a threat of sexual assault and failed to take remedial measures to ensure the safety of others. *Benson,* 561 N.W.2d at 540.

Some of plaintiffs' evidence fails to make such a showing. The Academy correctly points out that the student report of Johnson's "Chester the Molester" nickname and plaintiff Steve Higdem's report of Johnson's violation of the "no contact" policy led, within days, to Johnson's dismissal. There is no evidence of sexual abuse in the meantime. Moreover, although plaintiffs argue that there were "abounding rumors and complaints about Johnson's sexual misconduct," the only rumors which the depositions reveal are rumors that Johnson was a homosexual. (Barnett Dep. at 25–26.) The mere fact that a man has engaged in homosexual conduct "in no way indicates that he would commit a sexual assault." *Porter v. Harshfield,* 329 Ark. 130, 948 S.W.2d 83, 87 (1997).

There is, however, some evidence that the Academy was aware or should have become aware of Johnson's alleged propensity for sexual abuse. The Academy attempts to ignore the deposition testimony of Jumal Frazier, who stated that he told Barnett about a sexual assault some time before Johnson was dismissed, and prior to several occasions on which Frazier himself was again assaulted. Harvey Brown also testified that he told Barnett about an incident of back rubbing at Johnson's house prior to Johnson's dismissal from the Academy. While the Academy argues that Brown's testimony is incredible since he did not accurately identify Johnson in the police report, this argument goes to Brown's credibility and thus does not eliminate the factual question of whether Brown told the Academy about Johnson's sexual misconduct. The evidence of the two boys' statements to the Academy staff is sufficient to support plaintiffs' claim for negligent retention.

### c. Negligent Supervision

Plaintiffs have also offered sufficient evidence to support their negligent supervision claim. A defendant like the Academy commits the tort of negligent supervision if it fails to "use ordinary care

and protect its students from injury ... under circumstances where such conduct would reasonably have been foreseen and could have been prevented by the use of ordinary care." *P.L. v. Aubert,* 527 N.W.2d 142, 149 (Minn.App.1995), *rev'd on other grounds,* 545 N.W.2d 666 (Minn. 1996). In *Aubert,* the Court of Appeals of Minnesota initially held that a school's failure to review a teacher's lesson plans and its failure to prevent the teacher from locking her classroom door were sufficient to show negligent supervision of the teacher, who had entered into a sexual relationship with a student. *Id.* In reversing the Court of Appeals, the Minnesota Supreme Court did not disturb the appellate court's decision that a school could be liable for negligent supervision in cases where a teacher engages in sexual conduct with a student; rather, it refused to impose liability because "closer vigilance would not have uncovered the relationship [which] both parties worked hard to conceal." *P.L. v. Aubert,* 545 N.W.2d 666, 668 (Minn. 1996) In contrast to *Aubert,* the evidence in this case shows that other counselors were often in the hallway when Johnson was molesting plaintiffs in their rooms, and there is no evidence that plaintiffs "worked hard to conceal" the assaults. There is enough evidence for plaintiffs to show that enforcement of the Academy's alleged "no contact" and "no one-on-one meetings" policies would have constituted ordinary care and would have prevented their alleged injuries—evidence sufficient to support plaintiffs' claim of negligent supervision.

2. Negligent Infliction of Emotional Distress

■ Under South Dakota law, a plaintiff cannot recover damages for negligent infliction of emotional distress unless there is a causal nexus between his alleged distress and a physical injury. *Nelson v. WEB Water Development Ass'n, Inc.,* 507 N.W.2d 691, 699 (S.D.1993). This rule is generally enforced by requiring the manifestation of physical symptoms caused by the emotional distress. *See id.* As the

state supreme court has explained, the "physical consequences" requirement is based on at least three principal concerns:

> (1) the problem of permitting legal redress for harm that is often temporary and relatively trivial; (2) the danger that claims of mental harm will be falsified or imagined; and (3) the perceived unfairness of imposing heavy and disproportionate financial burdens on a defendant who was only negligent, for consequences which appear remote from the "wrongful" act.

*Wright v. Coca Cola Bottling Co.,* 414 N.W.2d 608, 610 (S.D.1987) (quoting *Prosser & Keeton on the Law of Torts,* § 54 at 360 (5th ed.1988)). The Academy asserts that plaintiffs' symptoms—depression, embarrassment, questioning their sexuality— are purely mental and as such cannot support recovery of damages. Plaintiffs are incorrect in asserting that a jury should decide whether such symptoms can support damages. *See First Nat'l Bank v. Drier,* 574 N.W.2d 597, 600 (S.D.1998) (diagnosed severe mental illness without a physical injury did not support an award of damages). And although plaintiffs argue, in their Response brief, that they suffer from physical symptoms such as loss of appetite and fatigue, that argument cannot prevent summary judgment, because they have not pointed to specific evidence in the record to support it.

■ Plaintiffs can still collect damages for emotional injuries because they suffered those injuries as the result of physical injuries. "Where the defendant's negligence inflicts an immediate physical injury, such as a broken leg, none of [the policy concerns supporting the 'physical consequences' requirement] has prevented the courts from allowing compensation for purely mental elements of damage accompanying it." *Prosser & Keeton, supra,* § 54 at 362–63. In such cases, "there is sufficient assurance that the mental injury is not feigned." *Id.* A sexual assault on a minor is the type of immediate physical injury which takes the "physical

consequences" requirement out of play. *See Wilson v. Tobiassen,* 97 Or.App. 527, 777 P.2d 1379, 1382–83 (1989) (upholding a verdict on plaintiff's claim of negligent infliction of emotional distress against the Boy Scouts of America, reasoning that physical impact requirement was satisfied by a scout leader's sexual assault on the plaintiff). The evidence of plaintiffs' mental injuries is thus sufficient to support a claim for damages.[4]

### 3. Intentional Infliction of Emotional Distress

■■■ In order to establish the tort of intentional infliction of emotional distress, plaintiffs must prove:

(1) an act by the defendant amounting to extreme and outrageous conduct; (2) intent on the part of the defendant to cause plaintiffs severe emotional distress; (3) the defendant's conduct was the cause-in-fact of the plaintiffs' injuries; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.

*Tibke v. McDougall,* 479 N.W.2d 898, 906 (S.D.1992). The requirement that the defendant's conduct be gross and extreme is based on the supreme court's judgment that such conduct is more likely to cause the required level of emotional distress and its determination to avoid litigation "in the field of bad manners." *Id.* at 907. Thus, this tort "requires conduct exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind." *Id.*

■■■ For the Academy to retain Johnson, after it had allegedly received reports that he was sexually molesting students, was extreme and outrageous. The Academy does not contend that such conduct is within the bounds tolerated by decent society, but rather that there is no evidence to support the allegations that they received reports of sexual misconduct by Johnson aside from the reports which led to his dismissal in January 1996. As noted above, these arguments ignore the testimony of Jumal Frazier and Harvey Brown, who stated that they complained to Academy staff about Johnson's sexual assaults long before Johnson's dismissal. This evidence of the Academy's knowledge of the complaints and its refusal to investigate is sufficient to support an inference that the Academy intended the emotional distress suffered by the victims who were harmed as a result of its failure to investigate and remove Johnson before January or February 1996. Dr. Ledral's psychological evaluations provide enough evidence for a jury to find that the sexual assaults caused plaintiffs' mental distress and the mental distress was severe. There is thus sufficient evidence to support plaintiffs' claim of intentional infliction of emotional distress.

### 4. Assault and Battery

■■■ Under South Dakota Law, an employer is liable for the intentional torts of its employee, if the employee is acting within the scope of his employment or with the apparent authority of the employer. *Primeaux v. United States,* 181 F.3d 876, 879–81 (8th Cir.1999) (en banc). The Eighth Circuit has distinguished the two theories, and associated the scope of employment test with *Morman v. Wagner,* 63 S.D. 547, 262 N.W. 78 (1935) and the apparent authority test with *Leafgreen v. American Family Mutual Ins. Co.,* 393 N.W.2d 275 (S.D.1986). *See Primeaux, supra.* Plaintiffs argue that the Academy is liable under *Leafgreen.*

■■■ Under the rule announced in *Leafgreen,* "a principal may be held liable for fraud and deceit committed by an agent within his apparent authority, even though the agent acts solely to benefit himself." *Leafgreen,* 393 N.W.2d at 277. This theory of liability is a form of estop-

---

**4.** The court does not address plaintiffs' argument, raised at the pretrial conference, that a diagnosis of Post–Traumatic Stress Disorder satisfies the physical consequences requirement.

pel, which prevents the principal "from asserting the agent's lack of authority because he clothed the agent with the authority to act, and the third party reasonably relied on that authority to his detriment." *Id.* at 280. In order to impose some limit on apparent authority, South Dakota law requires a nexus between the agent's employment and the activity which actually caused the injury sufficient to make the harm foreseeable. *Id.* Under this formulation, a harm is foreseeable if the employee's conduct "is not so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business." *Id.* at 280–81.

As the Eighth Circuit has recognized, the cases applying the apparent authority doctrine are "legion, and each is dependent on the peculiar fact situation presented." *Red Elk v. United States,* 62 F.3d 1102, 1105 (8th Cir.1995) (citation omitted). In *Leafgreen* itself, the supreme court found that an insurance agent was not acting within the scope of his employment when he used a visit to a residence, ostensibly made for the purposes of his job, but used to case the house for a burglary that took place a month later. The court refused to impose liability for the burglary on the insurance company. Based in part on the fact that the burglary occurred more than a month after the insurance agent viewed the house, the court concluded that while the agent's initial entrance into the home may have been incidental to his employment, the burglary itself clearly was not. *Leafgreen,* at 276, 281. Unlike the agent in *Leafgreen,* however, Johnson committed his assaults and batteries while he was on the clock at the Academy.

 That makes this case closer to *Red Elk,* in which the Eighth Circuit held that the government was liable for a tribal officer's rape of a 13–year old girl whom he had picked up for violating curfew. The court found it

> foreseeable that a male officer with authority to pick up a teenage girl out alone at night in violation of the curfew

might be tempted to violate his trust. [The officer] had that opportunity because of his employment, the trappings of his office, and the curfew policy he was to enforce.

*Red Elk,* 62 F.3d at 1107. As was the case in *Red Elk,* it is foreseeable that some male employees whose job requires them to supervise adolescent boys and gives them the opportunity to be alone with those boys will sexually molest the boys. *See, e.g., Wilson v. Tobiassen, supra,* (troop leader's molestation of a boy scout). Like the officer in *Red Elk,* Johnson got his opportunity allegedly to sexually assault plaintiffs through his employment, primarily his duty to conduct room checks. It is neither startling nor unfair for the Academy to face liability for his alleged actions. Plaintiffs have enough evidence to prove assault and battery committed personally by Johnson for which the Academy is responsible.

Contrary to the Academy's argument, *Primeaux* does not impair plaintiffs' ability to recover under the apparent authority doctrine. In *Primeaux,* the Eighth Circuit upheld Judge Battey's finding that a tribal officer acted outside the scope of his employment when he raped a woman whom he had picked up by the side of the road in a government vehicle. *Primeaux,* 181 F.3d at 882. At the time the rape occurred, the officer was off duty and, in Judge Battey's words, "on a frolic of his own and not acting in the course or scope of his employment." As Judge Battey's finding and the Eighth Circuit decision make clear, *Primeaux* was decided under the scope of employment test, which is separate from the doctrine of apparent authority. *See Primeaux,* 181 F.3d at 879–81. Since plaintiffs can show that Johnson was acting with the apparent authority of the Academy, there is no reason to decide whether Johnson's sexual contact with the boys occurred in the scope of his employment.

### 5. Failure to Report Child Abuse

The Academy argues that there is no private cause of action for failure to report child abuse, and plaintiffs agree. The Academy is therefore entitled to summary judgment on this issue as a matter of law.

### C. Punitive Damages

 Punitive damages are the subject both of the Academy's motion for summary judgment and plaintiffs' motion for punitive damages. Such damages cannot be awarded unless the Court finds, "after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton, or malicious conduct on the party of the party claimed against." SDCL 21–1–4.1. Mere negligence is not equivalent to willful and wanton misconduct. "Willful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant." *Tranby v. Brodock,* 348 N.W.2d 458, 461 (S.D.1984). In order to establish willful and wanton misconduct, plaintiffs must show a failure by the Academy to do something which it should have done under the circumstances about which it can be said that the Academy consciously realized would in all probability, as opposed to possibility, produce the precise result that it did produce and bring harm to plaintiffs. *See id.*

 The Academy's alleged indifference and scepticism toward the complaints which were made in late January 1996 cannot form the basis of a punitive damages award, because those complaints led directly to Johnson's dismissal, and there is no allegation that any of the plaintiffs were abused after Steve Higdem left the note for Barnett or that plaintiffs were harmed by Barnett's scepticism itself. However, the evidence of the Academy's failure to investigate the claimed earlier complaints of Jumal Frazier and Harvey Brown does form a reasonable basis to believe that the Academy's is guilty of willful and wanton misconduct. Such a failure, if proven, could amount to intentional infliction of emotional distress or show recklessness on the part of the Academy. That type of conduct can form the basis for an award of punitive damages. *See Bass v. Happy Rest, Inc.,* 507 N.W.2d 317, 324 (S.D.1993) ("Punitive damages may be considered in connection with intentional infliction of emotional distress."); *Dahl v. Sittner,* 474 N.W.2d 897, 903–904 (S.D.1991) (plaintiff may recover punitive damages against an employer for intentional tort committed by its employee if the employee was unfit and the employer was reckless in retaining or employing him). Plaintiffs are entitled to present evidence to the jury in support of their claim for punitive damages.

### CONCLUSION

Because SDCL 3–21–8 does not shield the Academy from liability for plaintiffs' claims, and for the other reasons stated above, the Academy is not entitled to summary judgment on any of plaintiffs' claims, except the claim of failure to report child abuse. Plaintiffs have provided a reasonable basis to believe that there was willful and wanton misconduct by the Academy in its failure to respond to the reports of sexual abuse by Jumal Frazier and Harvey Brown. Accordingly,

IT IS SO ORDERED:

(1) that the Academy's motion for summary judgment is granted in part and denied in part;

(2) that the Academy's motion for summary is granted as to Count V of the Complaint;

(3) that the Academy's motion for summary judgment is denied as to Counts I, II, III, IV, and VII of the Complaint.

(4) that plaintiffs' motion to proceed at trial regarding punitive damages is granted.