#25904-a-LSW

**2012 S.D. 50**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

DONALD HASS, AS PERSONAL
REPRESENTATIVE OF THE
ESTATE OF HARVEY SEVERSON,
DECEASED,                                              Plaintiff and Appellant,


    v.


PAUL WENTZLAFF,                                    Defendant,


    and


NORTH AMERICAN COMPANY FOR
LIFE AND HEALTH INSURANCE,


    and


ALLIANZ LIFE INSURANCE
COMPANY OF NORTH AMERICA,                Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE WILLIAM J. SRSTKA, JR.
Judge

* * * *

ARGUED ON APRIL 18, 2012

OPINION FILED **06/20/12**

JONATHAN K. VAN PATTEN
Vermillion, South Dakota

and

BRUCE M. FORD
Watertown, South Dakota

Attorneys for plaintiff
and appellant.


ERIC C. SCHULTE
TIMOTHY M. GEBHART of
Davenport, Evans, Hurwitz
 & Smith, LLP
Sioux Falls, South Dakota

Attorneys for defendant and
appellee North American
Company for Life & Health
Insurance.


JASON R. SUTTON
PAUL W. TSCHETTER of
Boyce, Greenfield, Pashby & Welk, LLP
Sioux Falls, South Dakota

Attorneys for defendant and
appellee Allianz Life Insurance
Company of North America.

#25904

WILBUR, Justice

[¶1.]          Paul Wentzlaff, an insurance agent, stole thousands of dollars from Harvey Severson, an elderly man who asked Wentzlaff to help manage his financial affairs.  Donald Hass, as personal representative for Severson's estate, sued Wentzlaff and two insurance companies who appointed Wentzlaff as an agent, North American Company for Life and Health Insurance (North American) and Allianz Life Insurance of North America (Allianz).  Hass and North American each moved for summary judgment and Allianz joined North American's motion.  After a hearing, the circuit court denied Hass's motion and granted the insurance companies' motion.  Hass appeals, arguing that the insurance companies are vicariously liable for Wentzlaff's acts.  We affirm.

### FACTS AND PROCEDURAL BACKGROUND

[¶2.]          Wentzlaff began working as an insurance agent in 1988.  From 1988 through 1995, Wentzlaff was an agent for Aid Association for Lutherans, working in Colorado and Minnesota.  Aid Association for Lutherans terminated Wentzlaff in late 1995 because of his sales practices, in part for not properly explaining a whole life policy.  Wentzlaff then moved to South Dakota and worked as an agent for Kansas City Life and, in the late 1990s, for Lutheran Brotherhood.  In 1997, Wentzlaff entered into a consent order with the South Dakota Division of Insurance under which he paid a $250 fine.  Wentzlaff was penalized for promoting and advertising a seminar on then-recent federal legislation in a way that sought to influence the purchase of insurance through "fright and scare tactics."

[¶3.]     In April 2001, Wentzlaff applied with North American.  The application required that Wentzlaff disclose whether a complaint had ever been filed against him by a state insurance department, National Association for Securities Dealers (NASD), or another regulatory agency.  Wentzlaff included a letter with his application, notifying North American of the 1997 consent order and attaching a copy of the order itself.  In May 2001, North American received a supplement to the disclosure, explaining that the 1997 consent order involved an "advertising violation" and revealing that Wentzlaff was appointed as an agent by several other insurance companies.  In August 2001, Lutheran Brotherhood reported that Wentzlaff failed to disclose or obtain approval for outside business and submitted non-genuine signatures on forms.  Because of this report, the NASD suspended Wentzlaff from working with any NASD dealer for two years.  Wentzlaff was also required to pay a $5,000 fine if he sought future employment as a securities broker for an NASD dealer.  The report and subsequent consent order were based on Wentzlaff engaging in outside business activities without notifying Lutheran Brotherhood and for failing to disclose that he was both the existing agent and insuring agent on several insurance replacement forms.

[¶4.]     Wentzlaff eventually started an independent insurance business.  As an independent agent, Wentzlaff could write for any insurance company that appointed him as an agent.  Wentzlaff applied to multiple insurance companies.  Wentzlaff was ultimately appointed by at least ten insurance companies, including North American and Allianz.  Wentzlaff never considered one insurance company to

be his primary company. In 2004, he formed Resource Development, Incorporated (RDI).

[¶5.] Joyce Farr met Wentzlaff sometime in 1999 when he spoke at her Lutheran church while he was working for Lutheran Brotherhood. Farr later became a client of Wentzlaff's, and Farr was pleased with his work. Around 2000, Farr introduced Wentzlaff to Harvey Severson, her brother and a retired farmer who had recently moved into an assisted living facility. Approximately six months after meeting Severson, Wentzlaff began assisting Severson with paying monthly bills and other financial affairs. Wentzlaff provided similar bookkeeping services to Farr. Wentzlaff would write checks and Severson would sign them. Wentzlaff charged Severson $200 per month, and later, $250 per month, for his bookkeeping services. Wentzlaff did not inform North American or Allianz that he was performing these services. Wentzlaff considered himself to be acting on behalf of RDI when providing the bookkeeping services.

[¶6.] When Severson and Wentzlaff first met, Severson had investments in mutual funds and annuities. Severson eventually authorized Wentzlaff to convert almost all of these investments into annuities with North American and Allianz. During this time, Wentzlaff indicated that he was with the Fellowship of Christian Estate Planners, Inc. Beginning in 2005, Wentzlaff began submitting requests to North American and Allianz to withdraw funds from Severson's annuities. The requests were signed by Severson. Wentzlaff told Severson that the money was needed to pay bills or that Wentzlaff would reinvest the funds. Wentzlaff asked that North American and Allianz directly deposit the funds into Severson's bank

account, and the companies complied. Allianz and North American deposited funds into Severson's account; Wentzlaff then wrote checks from Severson's account payable to RDI, had Severson sign them, and deposited the money into RDI's bank account. With each withdrawal, Allianz and North American mailed a letter to Severson advising him of the withdrawal, any surrender charges, and potential tax consequences.

[¶7.]     Wentzlaff provided similar services to Orlin Berge. When Berge's attorney became suspicious of Wentzlaff's practices, Wentzlaff prepared and Severson signed a letter requesting the surrender value of the entire Allianz policy. Again, Allianz notified Severson of the request by letter and thereafter wired the funds into Severson's account. Severson then signed checks payable to RDI, and Wentzlaff used the Allianz policy funds to pay back money stolen in a similar manner from Berge.

[¶8.]     Although some of the money was used to pay Severson's bills, Wentzlaff stole most of it, using the money for personal and business expenses and to cover his thefts from Berge's investments. In April 2007, a Minnehaha County grand jury indicted Wentzlaff on two counts of insurance fraud and eight counts of grand theft by embezzlement. Two days later, the South Dakota Department of Insurance issued an emergency order suspending Wentzlaff's license and mailed a copy to the insurance companies. Wentzlaff pleaded guilty to one count of grand theft of property received in trust and one count of committing a fraudulent insurance act. He was sentenced to twenty years in the state penitentiary and ordered to pay $472,000 in restitution.

[¶9.] Severson died in February 2008. North American paid Severson's estate $334,834.29 in death benefits in March 2008. Donald Hass, as personal representative of Severson's estate, sued Wentzlaff, North American, and Allianz. The complaint against the insurers alleged securities fraud, conversion, fraud and deceit, breach of fiduciary duty, and negligence, seeking to impose vicarious liability under the theory of *respondeat superior*.

[¶10.] Hass moved for partial summary judgment on liability. North American moved for summary judgment and Allianz joined North American's motion and all submissions in support of the motion. After a hearing, the circuit court granted the insurance companies' summary judgment motion. Hass appeals.

## STANDARD OF REVIEW

[¶11.] This Court reviews entry of summary judgment de novo. *Adrian v. Vonk*, 2011 S.D. 84, ¶ 8, 807 N.W.2d 119, 122.

> In reviewing a grant or denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Saathoff v. Kuhlman*, 2009 S.D. 17, ¶ 11, 763 N.W.2d 800, 804. We have also noted that,

> while we often distinguish between the moving and non-moving party in referring to the parties' summary judgment burdens,

the more precise inquiry looks to who will carry the burden of proof on the claim or defense at trial. Entry of summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*W. Consol. Coop. v. Pew*, 2011 S.D. 9, ¶ 21, 795 N.W.2d 390, 396.

[¶12.]      "Statutory interpretation is a question of law, reviewed de novo." *State ex rel. Dep't of Transp. v. Clark*, 2011 S.D. 20, ¶ 5, 798 N.W.2d 160, 162. "The purpose of statutory construction is to discover the true intention of the law, which is to be ascertained primarily from the language expressed in the statute." *Id.* Legislative intent is also "determined from the statute as a whole, as well as enactments relating to the same subject." *Id.* ¶ 10.

## ANALYSIS AND DECISION

[¶13.]      **1.      Did Hass preserve the argument that there are genuine issues of material fact?**

[¶14.]      Summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." SDCL 15-6-56(c). A party moving for summary judgment must submit a statement of material facts. SDCL 15-6-56(c)(1). A party opposing a summary judgment motion must include a "separate, short, and concise statement of the material facts as to which the opposing party contends a genuine issue exists to be tried." SDCL 15-6-56(c)(2); *Discover Bank v. Stanley*, 2008 S.D. 111, ¶ 23, 757 N.W.2d 756, 763. "The opposing party *must* respond to each numbered paragraph in the moving party's statement

with a separately numbered response and appropriate citations to the record."
SDCL 15-6-56(c)(2) (emphasis added); *see Discover Bank*, 2008 S.D. 111, ¶ 26, 757
N.W.2d at 764 (stating that the moving party's failure to file a statement of
undisputed material facts "denied [the non-moving party] the opportunity to submit
his mandatory statement controverting those undisputed facts"). "All material facts
set forth in the statement that the moving party is required to serve shall be
admitted unless controverted by the statement required to be served by the
opposing party." SDCL 15-6-56(c)(3).

[¶15.]     After a party files a summary judgment motion, "an adverse party may
not rest upon the mere allegations or denials of his pleading, but his response, by
affidavits or as otherwise provided in § 15-6-56, must set forth specific facts showing
that there is a genuine issue for trial." SDCL 15-6-56(e). "If he does not so respond,
summary judgment, if appropriate, shall be entered against him." *Id. See also*
*Dakota Indus., Inc. v. Cabela's.Com, Inc.*, 2009 S.D. 39, ¶ 14, 766 N.W.2d 510, 514
(finding that under SDCL 15-6-56(e), once the moving party meets its initial burden
of proof, the burden shifts to the non-moving party to identify facts disputing the
moving party's allegations).

[¶16.]     In this case, Hass moved for partial summary judgment on liability
and filed a statement of undisputed material facts. Allianz responded to Hass's
statement of undisputed material facts.[1] North American cross-moved for summary

---

1.     North American did not separately respond to Hass's statement of
       undisputed facts.

judgment and filed a statement of undisputed material facts. Allianz joined this motion and all submissions in support of the motion.

[¶17.]    Hass did not respond to the insurance companies' statement of undisputed material facts. At the summary judgment hearing, Hass's counsel said, "I think the Court correctly noted that there have been statements of undisputed material facts, which certainly as to North American are not disputed, nor we towards North American's statement of material facts." The circuit court, in its letter decision, stated that Hass "conceded at the hearing that there are no genuine issues of material fact."

[¶18.]    General arguments at the summary judgment hearing do not satisfy the requirement that Hass specifically respond to the insurance companies' statement of material facts. By failing to respond, all facts asserted by the insurance companies are deemed admitted. Furthermore, because Hass conceded that there are no genuine issues of material fact, SDCL 15-6-56(e) mandated that summary judgment be entered against Hass due to his failure to specifically respond to North American's motion and statement of facts, so long as the insurance companies were entitled to judgment as a matter of law. Therefore, Hass did not preserve his argument that genuine issues of fact precluded summary judgment in this case. Thus, we analyze whether North American and Allianz were entitled to judgment as a matter of law under the undisputed facts set forth in the parties' respective statements.

[¶19.]    **2.    Was Wentzlaff acting within his scope of employment with Allianz and North American when he stole money from Severson?**

[¶20.]    The doctrine of *respondeat superior* "hold[s] an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency." *Black's Law Dictionary* 1426 (9th ed. 2009). "[T]he question of whether the act of a servant was within the scope of employment must, in most cases, be a question of fact for the jury." *Kirlin v. Halverson*, 2008 S.D. 107, ¶ 16, 758 N.W.2d 436, 444 (citations omitted).

[¶21.]    We apply a two-part test when analyzing vicarious liability claims. *See id.* ¶¶ 24-25.[2] "[T]he fact finder must first determine whether the [act] was *wholly* motivated by the agent's personal interests or whether the act had a dual purpose, that is, to serve the master and to further personal interests." *Id.* ¶ 24. "When a servant acts with an intention to serve *solely* his own interests, this act is not within the scope of employment and his master may not be held liable for it." *Id.* "If the act was for a dual purpose, the fact finder must then consider the case presented and the factors relevant to the act's foreseeability in order to determine whether a nexus of foreseeability existed between the agent's employment and the activity which caused the injury." *Id.* ¶ 25. "If such a nexus exists, the fact finder must, finally, consider whether the conduct is so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's

---

2.    We were considering an agent's intentional use of force in *Kirlin*, but we find the standard equally applicable to other acts by an agent.

business." *Id.* (citing *Leafgreen v. Am. Family Mut. Ins. Co.*, 393 N.W.2d 275, 280-81 (S.D. 1986)).[3]

[¶22.]            **A.**     **Was Wentzlaff wholly motivated by his personal interests or did the thefts have a dual purpose?**

[¶23.]     We must first determine whether Wentzlaff's acts had a dual purpose. A principal may be liable for an agent's acts where the agent's "purpose, *however misguided*, is wholly or in part to further the [principal's] business[.]" *Id.* ¶ 22 (quoting Prosser and Keeton on the Law of Torts, § 70, 505-06 (5th ed. 1984)). "But if [the agent] acts from purely personal motives . . . he is considered in the ordinary case to have departed from his employment and the master is not liable." *Id.*

> An essential focus of inquiry remains: Were the [agent's] acts in furtherance of his employment? If the answer is yes, then employer liability may exist even if his [agent's] conduct was expressly forbidden by the [principal] . . . When a[n agent] acts

---

3.     Restatement (Second) of Agency has played a prevalent role in our vicarious liability jurisprudence as we often look to it for guidance. *See generally Kirlin*, 2008 S.D. 107, 758 N.W.2d 436; *see also Deuchar v. Foland Ranch, Inc.*, 410 N.W.2d 177 (S.D. 1987); *Leafgreen*, 393 N.W.2d 275. Restatement (Third) of Agency, adopted in 2005 and published in 2006, now supersedes Restatement (Second) of Agency, which was published in 1958. Justice Meierhenry noted this fact in her special concurrence in *Kirlin*. 2008 S.D. 107, ¶¶ 65-66, 758 N.W.2d at 456. Unlike Restatement (Second) of Agency, Restatement (Third) of Agency does not rely upon foreseeability in determining whether an employee's acts are within the scope of employment. Restatement (Third) of Agency § 7.07 cmt. b. Section 7.07 is "phrased in more general terms" than its counterparts in Restatement (Second) of Agency and focuses on an employee's intent and motivations rather than on the foreseeability of the acts. *Id.* Although both North American and Allianz cite to Restatement (Third) of Agency at some point, no one in this case has urged us to adopt it. Furthermore, we find that the two-part test established by this Court in *Kirlin* embodies both the employee intent element from Restatement (Third) of Agency § 7.07 and the foreseeability element from Restatement (Second) of Agency §§ 228 and 229 and our vicarious liability precedent.

> with an intention to serve solely his own interests, this act is not within the scope of employment, and [the principal] may not be held liable for it.

*Id.* (quoting *Deuchar*, 410 N.W.2d at 181).

[¶24.]     In this case, Hass seeks to hold the insurance companies liable for Wentzlaff's acts of theft. Wentzlaff stole Severson's money by writing checks from Severson's account to RDI. Wentzlaff had access to Severson's personal assets and accounts due to his bookkeeping position. These undisputed facts may establish that Wentzlaff was not serving North American or Allianz when he committed the thefts. If this is the case, then our inquiry into vicarious liability would end as Wentzlaff's actions would be outside the scope of his agency relationship with the insurance companies and the companies would not be liable for Wentzlaff's acts.

[¶25.]     However, the undisputed material facts also demonstrate that although Wentzlaff initially only withdrew the maximum amounts allowed before a penalty or surrender charge applied, Wentzlaff eventually began withdrawing amounts that resulted in surrender charges and interest adjustments. In fact, North American received over $36,000 in penalty fees or surrender charges due to the withdrawals on Severson's annuities which could be considered a benefit for the company. Therefore, if one measures the "act of theft" from the time Wentzlaff called the insurance company to start the withdrawal process so he could eventually steal the money, then it becomes more likely that Wentzlaff's purpose, at least in part, was to further the insurance companies' business.

[¶26.]     **B.     Was there a sufficient nexus of foreseeability between Wentzlaff's agency relationship and the thefts?**

[¶27.] We must next determine whether Wentzlaff's acts were foreseeable to decide whether North American and Allianz were entitled to summary judgment as a matter of law under the undisputed facts set forth in the parties' respective statements.

> [A] principal is liable for tortious harm caused by an agent where a nexus sufficient to make the harm foreseeable exists between the agent's employment and the activity which actually caused the injury; foreseeable is used in the sense that the employee's conduct must not be so unusual or startling that it would be unfair to include the loss caused by the injury among the costs of the employer's business.

*Leafgreen*, 393 N.W.2d at 280-81. "'Foreseeability' as used in the *respondeat superior* context [differs] from 'foreseeability' as used for proximate causation analysis in tort law." *Kirlin*, 2008 S.D. 107, ¶ 14, 758 N.W.2d at 444.

"In *respondeat superior*, foreseeability includes a range of conduct which is 'fairly regarded as typical of or *broadly incidental to* the enterprise undertaken by the employer.'" *Id.*

[¶28.] Although this Court considered certain factors in *Leafgreen v. American Family Mutual Insurance Co.*, Restatement (Second) of Agency § 229(2) contains more helpful criteria in analyzing foreseeability as it relates to vicarious liability. Restatement (Second) of Agency § 229(2) lists ten factors relevant to the scope of employment inquiry:

> (a) whether or not the act is one commonly done by such servants;
> (b) the time, place and purpose of the act;
> (c) the previous relations between the master and the servant;
> (d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

[¶29.]     Applying those factors to this case, Wentzlaff's acts were "seriously criminal."  In addition, neither North American nor Allianz had "reason to expect" that Wentzlaff would steal money from Severson because the undisputed material facts establish that Wentzlaff did not tell the insurance companies that he was providing bookkeeping services to Severson.  Also, the insurance companies notified Severson by letter before effectuating the withdrawals and thereafter followed Wentzlaff's instructions to deposit the funds directly into Severson's bank account. The undisputed facts also establish that Wentzlaff's bookkeeping services were completely separate from his work as an insurance agent and that Wentzlaff considered himself to be working on behalf of RDI when providing the bookkeeping services to Severson.[4]  Furthermore, the insurance companies in this case did not furnish "the instrumentality by which the harm [was] done" because Wentzlaff

---

4.     North American's statement of material fact number twenty-one provides:

> The monthly services Wentzlaff was providing Severson had nothing to do with his work as an independent insurance agent. [record citation] He never told North American or Allianz that he was performing these services or charging for them and considered himself to be acting on behalf of and for RDI.  [record citation].

completed the thefts by writing checks to RDI from Severson's personal account as Severson's bookkeeper, a position that was separate from his agency relationship with North American and Allianz. Given the undisputed facts in this case, we conclude that Wentzlaff's acts were unforeseeable.

[¶30.]        We agree with the circuit court's conclusion that the facts in this case are analogous to the facts in *Leafgreen*, 393 N.W.2d 275 on the foreseeability issue. In *Leafgreen*, an independent insurance agent became aware of a clients' lockbox containing jewelry and other valuables when visiting the home. *Id.* at 276. The agent and clients were also personal friends. *Id.* The agent learned through this friendship that the clients would be out of town and conspired with two felons to burglarize the clients' home. *Id.* The clients sued the insurance company, seeking to hold it liable for the criminal acts of the agent. *Id.* at 276-77. The insurance company moved for summary judgment, arguing that the agent was not acting within the scope of his employment when he conspired to burglarize the clients' home. *Id.* at 277. The circuit court granted the insurance company's motion, finding that the agent's acts were not reasonably foreseeable by the insurance company and thus, it would be unfair to impute the agent's acts to the company. *Id.* This Court agreed that the agent's criminal acts were unforeseeable and affirmed. *Id.* at 281.

[¶31.]        Like the insurance agent in *Leafgreen*, who was a friend of the clients, Wentzlaff was not merely an insurance agent but also provided bookkeeping services to Severson. Also like the agent in *Leafgreen*, who gained the necessary access and information through the personal friendship, Wentzlaff utilized his

bookkeeping position to carry out his plan and steal money from Severson.

Therefore, we find that Wentzlaff's criminal acts were unforeseeable.

[¶32.] An illustration following Restatement (Third) of Agency § 7.08[5] also guides our analysis:

> A sells an annuity issued by P Insurance Company to T. Later, A suggests that T surrender this annuity and authorize A to invest the proceeds on T's behalf in an annuity to be issued by S Insurance Company, a competitor of P Insurance Company. T agrees and surrenders the annuity to P Insurance Company, directing P Insurance Company to make the check for the proceeds payable to A. P Insurance Company does so. A appropriates the funds to A's own use. P Insurance Company is not subject to liability to T. P Insurance Company made no manifestation to T on the basis of which T could reasonably believe P Insurance Company authorized A, as its agent, to reinvest T's money with a competitor of P Insurance Company. A is subject to liability to T. A converted T's money. Also, T, by authorizing A at A's request to take control of T's money and to invest it on T's behalf, created an agency relationship with A. A breached A's duties to T as stated in §§ 8.01, 8.05(1), 8.09(1), and 8.12.

This illustration parallels the facts of this case, but there is one notable difference – in the illustration, the insurance company surrendered the client's money directly to the insurance agent and the agent misappropriated the money. Here, the undisputed material facts reveal that North American and Allianz not only contacted Severson before completing the withdrawal requests submitted by Wentzlaff, but the companies also directly deposited the funds into *Severson's* personal account. Severson then gave Wentzlaff access to the funds by signing

---

5. Restatement (Third) of Agency § 7.08 provides: "A principal is subject to vicarious liability for a tort committed by an agent in dealing or communicating with a third party on or purportedly on behalf of the principal when actions taken by the agent with apparent authority constitute the tort or enable the agent to conceal its commission."

checks written to RDI. Thus, it was Severson, not the insurance companies, who gave Wentzlaff direct access to the money.

[¶33.]    This illustration supports the conclusion that North American and Allianz are not liable to Severson for Wentzlaff's acts. Neither North American nor Allianz made a manifestation to Severson that Severson could reasonably believe to mean that the companies authorized Wentzlaff to reinvest Severson's money or convert the money after it was transferred to Severson's personal account.[6]

[¶34.]    Hass has not demonstrated that there is a sufficient nexus of foreseeability between the agency relationship and Wentzlaff's theft of Severson's money and thus, the insurance companies are entitled to judgment as a matter of law. We affirm the circuit court's grant of summary judgment in favor of North American and Allianz on the scope of employment issue.

[¶35.]    **3.    Did Wentzlaff's agency relationship with Allianz and North American enable Wentzlaff to carry out his theft, invoking liability under Restatement (Second) of Agency § 219(2)(d)?**

[¶36.]    Restatement (Second) of Agency § 219(2) provides four exceptions to the general rule that a principal is liable for the torts of an agent only if the agent was acting within the scope of his or her employment. One exception provides that

---

6.    Although not raised by the parties, it also appears that Severson, by authorizing Wentzlaff to take control of Severson's money and to invest it on his behalf, may have in fact created an independent agency relationship with Wentzlaff. Therefore, in addition to Wentzlaff's acts being unforeseeable, Wentzlaff was acting as Severson's agent, not an agent for North American or Allianz, when stealing money from Severson. However, even if Wentzlaff were acting as Severson's agent because of the bookkeeping relationship, the outcome of this case is the same and North American and Allianz are not liable for Wentzlaff's acts.

a principal may be liable for the torts of an agent acting outside of the scope of his or her employment if "the [agent] . . . was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1958). "In those cases, liability attaches because the tortfeasor's employment enabled or endowed him with a unique advantage to perpetrate the tortious acts." *Iverson v. NPC Int'l, Inc.*, 2011 S.D. 40, ¶ 9, 801 N.W.2d at 279. The comment to Section 219(2)(d) explains that "the [agent] may be able to cause harm because of his position as agent, as where a telegraph operator sends false messages purporting to come from third persons[.]" (citing Restatement (Second) of Agency, § 261 (1958)).

[¶37.]    In this case, Hass argues that Wentzlaff's agency relationship with North American and Allianz enabled him to steal Severson's money, thus invoking liability under § 219(2)(d). The insurance companies respond with three arguments: (1) that Hass failed to argue § 219(2)(d) to the circuit court; (2) that this Court has not yet adopted the Restatement (Second) of Agency § 219(2)(d) "aided by agency" theory of liability;[7] and (3) even if this Court adopts or has adopted the theory, it was Wentzlaff's position as Severson's bookkeeper, not his agency relationship with North American and Allianz, that enabled and aided Wentzlaff.

---

7.    We acknowledged Restatement (Second) of Agency § 219(2)(d) in *Iverson v. NPC International, Inc.*, 2011 S.D. 40, ¶ 9, 801 N.W.2d at 279. This Court concluded that under the facts in *Iverson*, "the agency relationship was immaterial to [the agent's] tort" and affirmed the lower court's grant of summary judgment to the principal. *Id.* ¶ 11. Thus, this Court applied the "aided by agency" theory but found that under this theory, the principal was not liable for the agent's acts. *See id.*

[¶38.]    At the summary judgment hearing, Hass's counsel specifically referred to Restatement (Second) of Agency § 261 but not § 219.  The circuit court did not cite or rely upon § 219 but did cite and discuss § 261.  On appeal, Hass addresses both § 219 and § 261 under the same issue.  However, there are significant differences between the sections.  While § 261 addresses whether an agent is "enabled" by the agency relationship, § 261 applies *only* if the agent was acting with apparent authority and thus, within the scope of employment.  In contrast, § 219(2)(d) embodies the theory that, *if the agent is acting outside the scope of employment*, the principal may nevertheless be liable if the agency relationship enabled the agent.

[¶39.]    In this case, Hass's assertion that Wentzlaff was enabled by his agency relationship with the insurance companies went to his scope of employment argument.  Hass never once argued below that Wentzlaff was acting outside the scope of employment, thus invoking liability under § 219(2)(d).  Therefore, even though the circuit court concluded that "Wentzlaff's agency relationship with North American and Allianz did not enable him to commit or conceal the thefts[,]" this conclusion was a part of the court's decision on the scope of employment issue rather than a conclusion relating to § 219(2)(d).  Indeed, the circuit court did not address § 219(2)(d) because Hass never raised this issue to the court.

[¶40.]    The record demonstrates that Hass never argued that Wentzlaff was outside his scope of employment to the circuit court, invoking § 219(2)(d).  Therefore, Hass failed to preserve this argument and we decline to address it for the first time on appeal.  *See Alvine Family Ltd. P'ship v. Hagemann*, 2010 S.D. 28, ¶

21, 780 N.W.2d 507, 514 ("We have consistently held that this Court may not review theories argued for the first time on appeal.").

[¶41.] **4.    Does SDCL 58-30-176 impose a higher standard of liability on insurance companies?**

[¶42.]    SDCL 58-30-176 provides:

> To appoint an insurance producer or business entity as its agent, the appointing insurer shall file, in a format approved by the director, a notice of appointment within fifteen days from the date the agency contract is executed or the first insurance application is submitted. An insurer may also elect to appoint an insurance producer to all or some insurers within the insurer's holding company system or group by the filing of a single appointment request. *The insurer is responsible for the acts of its representatives and insurance producers*, including those acts where the insurance producer has solicited, sold, or negotiated insurance on behalf of that insurer prior to the date of appointment.

(Emphasis added.)

[¶43.]    Hass argues that SDCL 58-30-176 supplements agency common law and imposes a strict-liability-like standard on insurance companies for the acts of their agents. To support this argument, Hass focuses on the above emphasized language in SDCL 58-30-176 as well as this Court's decision in *State v. Wingler*, 2007 S.D. 59, 734 N.W.2d 795. In *Wingler*, an insurance agent convinced clients to cash in annuities and purchase new annuities from the agent, promising the clients better returns on their investments. *Id.* ¶ 2. The agent had the clients write checks to a fictitious company and then the agent deposited the money into his personal accounts. *Id.* The clients' funds were not used to purchase new annuities but instead, the agent misappropriated the money for his personal use. *Id.* The agent was indicted on six counts of committing a fraudulent insurance act and seven

counts of grand theft of property received in trust. *Id.* ¶ 3. The agent pleaded

guilty to five counts of grand theft of property received in trust. *Id.* The circuit

court granted restitution to some of the clients and to the insurance company, and

the agent appealed to this Court. *Id.* ¶ 4.

[¶44.]	This Court affirmed the trial court's award of restitution. *Id.* ¶ 22. In

doing so, this Court stated:

> The trial court's conclusions . . . are supported by the record and
> applicable authorities. SDCL 58-30-176 provides in pertinent
> part that, "[t]he insurer is responsible for the acts of its
> representatives and insurance producers[.]" This Court has
> further held under the law of agency that, "[g]enerally, a
> principal may be held liable for the fraud and deceit of his agent
> acting within the scope of his actual or apparent authority, even
> though the principal was unaware of or received no benefit from
> his agent's conduct." *McKinney v. Pioneer Life Ins. Co.*, 465
> N.W.2d 192, 194 (S.D. 1991). Thus, [the insurance company]
> was made liable by statute and as an implied condition of its
> principal/agent relationship or contract with [the agent] to
> indemnify others suffering pecuniary damages as a result of [the
> agent's] fraud and deceit committed within the scope of his
> actual or apparent authority. [The agent] does not dispute this
> and concedes in his brief that [the insurance company]
> reimbursed the victims pursuant to the statutory obligation
> created by SDCL 58-30-176 and principles of agency.

*Id.* ¶ 20.

[¶45.]	North American and Allianz assert, and the circuit court concluded,

that this Court's decision in *North Star Mutual Insurance Co. v. Rasmussen*, 2007

S.D. 55, 734 N.W.2d 352[8] is more applicable. In *North Star*, an insurance agent

negligently failed to procure proper coverage for a client. *Id.* ¶ 6. After the

insurance company denied the client coverage, the company filed a declaratory

---

8.	This Court decided *North Star* one week prior to deciding *Wingler*.

judgment action, "seeking a ruling that [the insurance company] had no duty to defend or indemnify [the client] under the policy." *Id.* ¶¶ 1, 11. Both parties filed summary judgment motions. *Id.* ¶ 11. The circuit court granted the insurance company's motion, holding that the agent was the client's agent rather than the insurance company's agent and therefore, the agent's negligence could not be imputed to the insurance company. *Id.* ¶¶ 11-12. On appeal, the client, as an alternative argument, asserted that SDCL 58-30-176 (effective July 1, 2001) retroactively applied, thus making the insurance company liable for the agent's acts. *Id.* ¶ 37. This Court affirmed the lower court, finding that SDCL 58-30-176 did not apply retroactively. *Id.* ¶¶ 36-38. This Court noted:

> Even assuming these statutes do control and assuming [the agent] would be considered an agent of [the insurer] under SDCL 25-30-142 [sic], "*[s]tatutes regulating licensing and defining agents, brokers and solicitors, are not intended to change or to exclude the general laws of agency.*" *Boyter v. Blazer Const. Co.*, 505 So. 2d 854, 860 (La. App. 1987) (citing *Tiner v. Aetna Life Ins. Co.*, 291 So. 2d 774, 777 (La. 1974)); *see also Vina v. Jefferson Ins. Co. of New York*, 761 P.2d 581, 585 (Utah App. 1988) ("insurance code's purpose is 'primarily for the purpose of regulating insurance companies, agents, brokers, solicitors and adjusters' and does not supplant ordinary legal principles of agency") (quoting *Farrington v. Granite State Fire Ins. Co.*, 120 Utah 109, 232 P.2d 754, 756 (1951)); Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 45:2 (3d ed. 1996); *Damon's Missouri, Inc. v. Davis*, 63 Ohio St. 3d 605, 590 N.E.2d 254, 258 (1992).

*Id.* ¶ 39 (emphasis added).

[¶46.]     This Court's review of SDCL 58-30-176 in both *Wingler* and *North Star* is dicta. This Court was less concerned with principles of agency law in *Wingler*, a criminal restitution case, than it was in *North Star* and thus, *North Star* is more applicable in this case. We acknowledge that based upon our decision in *Wingler*,

SDCL 58-30-176 applies in this case, but we affirm our statement in *North Star* that statutes regulating the insurance agency, including SDCL 58-30-176, do not change or exclude agency common law. Indeed, in *Wingler*, the statute *and* general laws of agency together created an obligation for the insurance company. *Wingler*, 2007 S.D. 59, ¶ 20, 734 N.W.2d at 800. Moreover, Hass asks this Court to parse one sentence from SDCL 58-30-176, but after reading the statute as a whole and in light of other statutes regulating insurance, we find that the Legislature did not intend to impose strict liability upon insurance companies for any acts by an insurance agent. Therefore, we conclude that SDCL 58-30-176 does not impose strict liability upon insurance companies for the acts of their agents.

[¶47.] Considering SDCL 58-30-176 along with agency common law, we find that the facts in this case are distinguishable from the facts in *Wingler*. Here, unlike the agent in *Wingler*, Wentzlaff actually purchased the annuities that he told Severson he would purchase. Also unlike the agent in *Wingler*, Wentzlaff had direct access to Severson's bank accounts because Wentzlaff served as Severson's bookkeeper and financial advisor. Therefore, we conclude that North American and Allianz are not liable for Wentzlaff's acts under SDCL 58-30-176 and general principles of agency common law, and we affirm the circuit court's grant of summary judgment to North American and Allianz on this issue.

## CONCLUSION

[¶48.] Based upon the undisputed material facts, Wentzlaff was not acting within the scope of his employment when he stole money from Severson, and thus, as a matter of law, North American and Allianz are not vicariously liable for

Wentzlaff's acts. Furthermore, Hass failed to preserve his argument that the insurance companies are liable under Restatement (Second) Agency § 219(2)(d) because Hass did not present this argument to the circuit court. Finally, SDCL 58-30-176 does not impose strict liability upon insurance companies for the acts of their agents. We affirm the circuit court's grant of summary judgment in favor of North American and Allianz.

[¶49.]      Affirmed.

[¶50.]      GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, and BASTIAN, Circuit Court Judge, concur.

[¶51.]      BASTIAN, Circuit Court Judge, sitting for SEVERSON, Justice disqualified.